## KNAPP v. WILL & BAUMER CO.

(Circuit Court of Appeals, Second Circuit.    March 9, 1921.)

No. 118.

1. **Patents ⬯28, 43—Patentable design must disclose novelty and invention.**

Though the design patent law was intended to encourage the decorative arts, and deals with the appearance of the thing designed rather than with its structure, uses, or functions, in a design patent, as in a mechanical patent, the subject-matter must be novel, and must have called for an exercise of invention.

2. **Patents ⬯43—Square instead of round shape for candle does not disclose novelty of design.**

The right to make any article round or square, or in any other standard form or shape, is inherently open to all, and novelty cannot be predicated of a design for a square candle, instead of the ordinary round one.

3. **Patents ⬯28—Invention in design requires as much originality as in utility patents.**

Design patents stand on as high a plane as utility patents, and require as high a degree of exercise of the inventive or original faculty, and making a candle square, instead of round, does not involve the exercise of such faculty.

4. **Patents ⬯112(3)—Burden is on person attacking patent to show conclusions of Patent Office were wrong.**

The grant of the patent by the Patent Office makes a prima facie case for the successful applicant, and one who attacks the patent has the burden of showing that the Patent Office reached a wrong conclusion concerning it.

5. **Patents ⬯328—44,480 for design for candles held invalid for want of invention.**

The Knapp patent, No. 44,480, for a design for a candle, which consisted in taking the ordinary coach candle, making it square and giving it a fluted tapering base, both of which were known to the art before, does not show invention because of the bell-shaped top, which was similar to the top of the coach candle.

6. **Patents ⬯28—New combination of old elements patentable design only if it discloses invention.**

Though design invention may reside in the new combination of old elements, a new combination of such elements is only patentable if it is beyond the capacity of the ordinary routine designer.

Appeal from the District Court of the United States for the Northern District of New York.

Suit by Edward J. Knapp against the Will & Baumer Company for infringement of a design patent. From an interlocutory decree for complainant (253 Fed. 191), defendant appeals. Reversed, and bill dismissed.

Howard P. Denison and Eugene A. Thompson, both of Syracuse, N. Y., for appellant.

Wordsworth B. Matterson and Frank T. Miller, both of Syracuse, N. Y., and William G. Henderson, of Washington, D. C., for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is a suit in equity arising under the patent laws of the United States. The plaintiff is the owner of letters

patent No. 44,480, issued to him by the United States Patent Office on August 13, 1913, and is a design patent for an improvement in candles.

The patent has never been assigned, and the plaintiff is now and always has been the sole owner of the patent. He has caused large numbers of candles embodying the patented design to be made and sold under his license by the Edward J. Knapp Candle Company, a corporation existing under the laws of the state of New York, with its principal place of business at Syracuse in said state. The plaintiff is a large stockholder in the company, as well as its president and manager, and alleges that he derives large profits from the manufacture and sale of the patented candles. The license is personal, and not assignable, and not in writing.

In his application for the patent the plaintiff states that the following is a specification, reference being had to the accompanying drawing, forming a part thereof:

"The figure is a perspective view of a candle, showing my new design. The design as illustrated in the drawing is a pillar or column substantially square in cross-section, mounted upon a substantially cylindrical longitudinally fluted pedestal and surmounted by a bell-shaped cap, with its base lines set back from the square edges of the pillar top.

"I claim: The ornamental design for a candle, as shown and described."

The following is a fac simile of the drawing filed with the application:

The court below entered a decree holding that the patent was valid and infringed by the defendant. 253 Fed. 191. The case was heard again in that court on new and additional evidence, for the introduction of which the prior decree was opened. But at the second hearing the court adhered to the former decision. "I regard this," said the District Judge, "as a close case, but on consideration of the evidence heretofore taken and the new and additional evidence I am constrained to adhere to the decision made."

The application for this patent was filed February 3, 1911, and on March 11, 1911, was rejected, by the Examiner in the Patent Office, on the state of the art cited. The Examiner declared: "There is held to be nothing patentably novel set up in this application." On April 19, 1911, it was again rejected by the Examiner on the ground of want of any patentable novelty. On October 10, 1911, another application was filed; the original having been amended. On November 23, 1911, the applicant was informed that the application was again rejected, and was informed that—

"It must be again held that applicant's design fails to present anything patentably novel from an ornamental standpoint over the reference of record. * * * The claim is accordingly again and finally rejected on the state of the art cited."

The case was then appealed to the Board of Examiners in Chief. On July 10, 1913, the board sustained the application and reversed the examiner. They said:

"There appears to us to be a certain unity in design between a rectangular form of a candle and that of the tip, which possesses some degree of novelty and invention, which is sufficient to support a design patent, and we therefore reverse the decision of the Examiner."

On August 12, 1913, the patent was accordingly issued.

[1] The design law was intended to encourage the decorative arts. It therefore deals with the appearance of the thing designed, rather than with its structure, uses, or functions. But in a design patent, as in a mechanical patent, the subject-matter must be novel, and must have called for an exercise of the inventive faculties. If either of these essentials is absent, the patent cannot be sustained.

[2, 3] In order that there may be novelty, the thing must not have been known to any one before. Mere novelty of form is insufficient. O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601. The patent in suit is a square candle. But any one had as much right to make a candle square as to make it round. There are some standard forms and shapes that are known to every one and inherently open to any one to use. The right to make any article round or square is open to all. Novelty cannot be predicated of either. But it is equally plain that to make candles square, instead of round, does not involve any exercise of the inventive faculties, and invention is required as much in design patents as in other kinds of patents. It has been held that design patents stand on as high a plane as utility patents and require as high a degree of exercise of the inventive or original faculty. Perry v. Hoskins (C. C.) 111 Fed. 1002; Myers v. Sternheim, 97 Fed. 625, 38 C. C. A. 345; Western Electric Mfg. Co. v. Odell (D. C.) 18 Fed. 321.

But the patent appears to have been granted upon the theory that there is "some degree of novelty and invention" in the combination of the bell-shaped tip with the square form of the candle; that is, in the setting back of the base of the bell shaped cap from the square edges of the square column having flat sides. That was certainly the theory upon which the validity of the patent was sustained in the court below and the theory upon which the patent was granted in the Patent Office. In the court below the District Judge said:

"While, in view of the prior art, it may be doubted whether there is patentable invention in this combination containing this feature, I am inclined to hold the patent valid as the presumption is in its favor."

[4] The grant of the patent by the Patent Office makes out a prima facie case for the successful applicant, and one who attacks it has the burden of showing that the Patent Office reached a wrong conclusion concerning it. And in our opinion in this case the burden of proof has been sustained by the defendant.

[5] It must be conceded that, if there is any possibility of inventive genius being present in this design patent, it can only be found in the peculiar form of the tip. What Knapp has done was to place a small coach candle tip in the center of a square column. To do this did not

show patentable novelty or involve inventive genius. The patent in suit was, as we have seen, granted in August, 1913. But in 1906 there was published Lamborn's American Soaps, Candles and Glycerine. That work, on page 526, contains the following statement:

"Candles are molded in a great variety of shapes; the most common shape being that of a plain cylinder of varying diameter and length. A great variety of ornamental forms for religious and decorative purposes are molded in numerous prismatic cross-sections, as squares. triangular, octagonal, etc. They may also be molded longitudinally or spirally fluted."

And on page 530 there is the following statement:

"Candles may be made with tapering butts, to enable them to fit any holder either by use of the tapering machine shown in Fig. 201, or by the use of additional molds inserted in the fluted or regular candle mold. A type of candle of this description is shown in Fig. 197. The first self-fitting end candle is attributed to Field, who in 1861 patented his device for giving candles a conical end or butt by molding."

Knapp's own testimony admits that the base of his candle was not new. This is his admission:

"Q. Was it also ancient to make candles with this particular kind of a base on them? A. That was made a good many years ago, I believe; back 20 years, that I know of."

The following is an illuminating excerpt from his testimony:

"Q. Now take Plaintiff's Exhibit 4 and tell us of record. Show his honor exactly how you made that particular candle. In the first place, you started with what sort of a candle? A. A round candle.

"Q. Probably such as his honor referred to yesterday? A. I should imagine it was. After the round candle was casted, it was drawn through a hot die, and that die was square; the result is, it made that candle.

"Q. It transformed that from a round candle into a square candle? A. Into a square candle.

"Q. Where did you learn that sort of thing? A. The die for drawing candles?

"Q. Yes. A. Oh, about 25 years ago.

"Q. When you were with the Will & Baumer people, or associated with them? A. Yes.

"Q. That was a common practice, was it not? A. Oh, yes, that was sort of an ancient practice, I guess. The idea is to smooth the candle.

"Q. To form the candle? A. To form the candle.

"Q. And were those dies always round, through which the candle was drawn? A. Some of the dies are round.

"Q. What other shapes were there? A. We only had round and square dies at my plant. And we have had a die that was corrugated.

"Q. Now, we have got the shank of the candle formed. Now, please form the lower end of it, which we term the base. How do you do that? A. The candle is put into warm water, the lower end of it; when the candle gets pliable, it is placed into a die, and it forms that corrugated base.

"Q. And where and when did you first learn about that operation, of taking the ends of a candle—warming the end and forming it? A. At the Mosbroder plant, 25 years ago, when I went there.

"Q. Was that connected in any way with Will & Baumer? A. It was not. They were not organized in those days.

"Q. But later, before you manufactured your square candles, the Will & Baumer Company to your knowledge did form the end of the candles in that same way, did they not? A. Oh, yes.

"Q. And that end is the same as formed on the round candles? A. Certainly.

"Q. Previous to that time you made round candles with that particular end, did you not? A. Yes.

"Q. And that has been an old practice for many years? A. Yes.

"Q. What is the purpose of it? In candle language, it is called self-fitting. A. That is the usual term.

"Q. And it is usually at its upper part larger diameter than at the other end? A. Certainly.

"Q. Sometimes candles are made with that end, and sometimes without? A. Yes.

"Q. And to your knowledge thousands have been made that way many years before your application was filed? A. Certainly.

"Q. Now, take the other end, Mr. Knapp; when was the upper end on that candle formed? A. The bell shape?

"Q. The bell-shaped end; the upper end. A. That round shape was a very old pattern; I should imagine it was.

"Q. When did you first see candles with a small bell-shaped end on a larger upper portion of the candle? A. Oh, well, I guess ever since I have been in the candle business. It is originally what they called a coach candle.

"Q. That is the candle term a coach candle? A. Yes."

Knapp's own testimony as to the designing of his patented candle convinces us that the square candle of his patent involved no inventive thought or practice. He followed precisely the teachings of the art as set forth by Lamborn. What he did was to take a coach candle of ordinary type as shown by Lamborn and draw it through a square mold, a thoroughly familiar process, and then equip it with a self-fitting base as directed by Lamborn. The effect of these several steps is disclosed in the following cuts:

ORDINARY
COACH CANDLE

ONE SQUARED
AS DESCRIBED
BY LAMBORN

ONE PROVIDED
WITH SELF-FITTING
BASE AS DESCRIBED
BY LAMBORN.

What Knapp did involved no inventive act. He took an ordinary coach candle, with its bell shaped tip, and simply changed the column from a round one into a square one, leaving the bell-shaped tip the

same as before. In converting a round column into a square one, he followed precisely the teachings of the art as previously set forth by Lamborn. He did what any ordinary workmen would have done—drew a round candle through a square mold in accordance with a common practice. Then he provided it with a self-fitting base in accordance with the teachings of the art since 1861.

[6] It is true that invention may reside in a new combination of old elements. Every new combination of old elements, however, is not patentable. But as this court said in Steffens v. Steiner, 232 Fed. 862, 147 C. C. A. 56:

"The question in the case at bar is not whether a design patent can be sustained, although each separate element in the design may be old, but it is whether what has been done in assembling the old elements in the new designs rose in these particular cases to the level of invention."

And in Strause Gas Iron Co. v. William M. Crane Co., 235 Fed. 126, 148 C. C. A. 620, this court again said:

"The test for invention is to be considered the same for designs as for mechanical patents; i. e., was the new combination within the range of the ordinary routine designer?"

In both of those cases this court held design patents void for want of invention. In what was held in those cases we were simply applying the doctrine which was announced in Smith v. Whitman Saddle Co., 148 U. S. 675, 13 Sup. Ct. 768, 37 L. Ed. 606, in which case the court approved the following statement:

"To entitle a party to the benefit of the act, in either case, there must be originality, and the exercise of the inventive faculty. In the one, there must be novelty and utility; in the other, originality and beauty. Mere mechanical skill is insufficient. There must be something akin to genius—an effort of the brain as well as the hand. The adaption of old devices or forms to new purposes, however convenient, useful, or beautiful they may be in their new rôle, is not invention."

We are quite at a loss to find in the patent in suit anything "akin to genius" in what the patentee did. We find nothing beyond the ability of the ordinary routine candle maker. What was done did not rise to the level of invention.

As the patent in suit is not valid, it is not necessary to inquire whether it has been infringed.

The decree must be reversed, and the bill dismissed. It is so ordered.