BOWLES, Administrator, O.P.A., v. BIBER-MAN BROS., Inc.

No. 9009.

Circuit Court of Appeals, Third Circuit.

Argued Aug. 24, 1945.

Decided Sept. 21, 1945.

As Amended Dec. 6, 1945.

On Second Petition for Rehearing
Jan. 8, 1946.

BIGGS, Circuit Judge.

The Administrator of the Office of Price Administration sued Biberman Bros., Inc., pursuant to Section 205(a) and (e) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix § 925(a) and (e), for injunctive relief and for treble damages. The Administrator alleges that Biberman, a manufacturer of dresses, violated Section 4(a) of the Act, 50 U.S.C.A. Appendix § 904(a), because it failed to comply with Maximum Price Regulation No. 287, 7 F.R. 10460, as revised and amended.[1] In substance the Administrator charges that Biberman sold dresses at prices in excess of the maximum prices prescribed for women's and misses' dresses sold by manufacturers other than at retail because it included in its minimum allowable costs for its price lines, as "direct labor costs," the amount of a wage increase of 8½% actually paid by it under the circumstances set out hereinafter. The case falls into two parts: (1), was the defendant under the Regulations entitled to charge the wage increase into its direct labor costs, and (2), if it was not was there an actual price ceiling which the defendant violated?

█ The case was tried to the court and at the conclusion of the plaintiff's case the defendant moved to dismiss the action, reserving the right to proceed to its defense if the motion was denied. See Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following Section 723c. The court below granted the motion and dismissed. Since the dismissal was without specification to the contrary, the dismissal operated as an adjudication of the merits of the controversy. The Administrator has appealed.

### (1)

The defendant gave its employees an 8½% wage increase, and as we have stated, included the increase in its costs of manufacturing as direct labor costs. If the raise is includable in direct labor costs, the plaintiff concedes that there has been no violation of the Act. Conversely the defendant admits that if the increase may not be included in such costs it has violated Section 30(a) (10) of the Regulation.[2]

Joseph Forer, of Washington, D. C. (George Moncharsh, Deputy Adm'r for Enforcement, and David London, Chief, Appellate Branch, OPA, both of Washington, D. C., and Robert J. Callaghan, Dist. Enforcement Atty., and Sydney M. Friedman, Enforcement Atty., OPA, both of Philadelphia, Pa., on the brief), for appellant.

Harry Shapiro of Philadelphia, Pa. (Shapiro & Shapiro, of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, GOODRICH, and McLAUGHLIN, Circuit Judges.

---

[1] See MPR 287, 8 F.R. 9122, as amended, 2 Pike & Fischer, OPA Consumers' Goods Desk Book, p. 28101.

[2] The pertinent part of Section 30(a) (10) follows:

" 'Direct labor costs' shall be calculated on the basis of wage rates paid by you on March 13, 1942, plus any subsequent increase thereto pursuant to a collective bargaining contract or other wage agree-

For some years prior to June, 1943, the defendant, as a member of the Philadelphia Waist and Dress Manufacturers' Association, paid its employees wages according to rates indicated by three contracts entered into by the Association respectively with certain unions on September 12, 1940.[3] The contracts provided also that in case of any dispute as to wages the decision of the Impartial Chairman should bind the parties.

In June, 1943, a dispute as to rates of pay arose between the defendant and its employees and the union representing the latter. The employees contended that the manufacturers had eliminated or decreased the manufacture of their lower priced items and had shifted their business to higher price lines. The employees claimed that in accordance with the practice of the industry, persons working on higher priced merchandise are entitled to a higher rate of pay. The dispute was referred to Dr. Jacob Billikopf, the Impartial Chairman, pursuant to Clause 44 of the contract.

Dr. Billikopf rendered his decision on June 28, 1943, in which he stated in part, "The union demands a 15% flat increase in wage rates and wage scales to compensate for the entire market shift. This the Association strongly opposes." The Chairman concluded that Clause 44 of the collective agreement required an adjustment of wage scales and wage rates and allowed an 8½% increase.

The Administrator contends that the defendant was not entitled to include the wage increase in its direct labor costs for two reasons: (1) because the contract between the Association and the Union under which the Chairman rendered his decision for the wage increase was not the kind of collective bargaining contract designated in Section 30(a) (10) in that it did not provide for an "unconditional" wage increase; and, (2) because the Chairman erred in his construction of Clause 44 by concluding

that it did. It is not our function, we think, to review the decision of the Impartial Chairman. We assume that he was right. But even so, that alone will not bring the wage increase within the terms of Section 30(a) (10).

The Administrator held the wage increase not to be within the purview of the Regulation and informed the defendant to this effect on September 11 and November 3, 1943. Turning to Clause 44 of the contract, it is clear that the Administrator's ruling was correct and that the provision in question does not require unconditionally an increase in wages in a fixed amount. On the contrary, it merely authorizes an increase in wage rates with reference to other contracts not specifically identified and not in evidence. While the collective bargaining contracts containing Clause 44, under which the Impartial Chairman acted were dated September 12, 1940, nearly two years prior to the critical date, July 1, 1942, specified in the Regulation, the defendant's difficulty lies in the fact that Clause 44 does not contain any express provision for a wage increase subsequent to the date of the contracts in any fixed amount or per cent. The clause refers to the governance of the defendant's employees' wages "on garments or articles * * * other than those for which this agreement is intended * * * by the provisions of the Union agreements in the respective industries for such other garments or articles". The Chairman gave this clause an effect as if it provided: "If a member of the Association shifts from low price lines to high price lines, the member must pay an increase in wages because higher rates are paid by those manufacturers who manufacture higher price lines as required by their union contracts."

The record contains no union agreement which might be incorporated by reference into Clause 44 to bring that clause within the purview of Section 30(a) (10). The

ment, which contract was entered into on or before July 1, 1942, and provides for an unconditional increase of wage rates of a fixed amount or per cent. If you paid wage rates at the time of cutting in excess of the above basis, proper downward adjustments shall be made in calculating the labor costs for the garments."

[3] The provisions of the three contracts, mutatis mutandis, are substantially identical. Each, however, embraces a different phase of the industry, according to the nature of the garments manufactured. Clause 44 of these contracts provides:

"The wage scales, hours and prices on garments or articles manufactured by the members of the Association other than those for which this agreement is intended shall be governed by the provisions of the Union agreements in the respective industries for such other garments or articles. The present special arrangements concerning rayon garments shall continue.

"In the event of any dispute under this paragraph, the matter shall be referred to the Impartial Chairman, whose decision shall be binding."

Administrator takes the position that there is none, but it is not necessary to pass on this issue. It is obvious that while the Chairman's decision as of June 28, 1943, did provide for an unconditional increase of wage rates at the fixed amount of 8½%, he arrived at this result by approximating the wage shift to higher price lines in the entire industry. It appears from the Chairman's opinion that whereas for some manufacturers the shift would warrant a 15% increase in wages as contended by the Union, in others it would not. The Chairman, therefore, ordered the 8½% wage increase as a median increase. The increase could have been either higher or lower. It was merely a mediative result. The Chairman's conclusion and directive were binding upon the defendant and the defendant's employees but not upon the public or upon its representative, the Administrator. The fact that the defendant had to pay, and in fact did pay, the increase is immaterial to the issue before us. We conclude that the increase was not such a one as to come within the purview of Section 30(a) (10) and, therefore, may not be included as part of the defendant's direct labor costs. It follows that the defendant had no right insofar as the Price Control Act and the Regulations promulgated thereunder are concerned to compute the wage increase as a factor in its minimum allowable costs in determining the price of its commodities.

(2)

We will endeavor to deal now with the question of whether the defendant exceeded the price ceiling. MPR 287 was designed to establish maximum price ceilings for certain types of apparel including women's outerwear of the kinds manufactured by the defendant. Flat price ceilings are not used for these articles. This is due in part to the fact that the exact items manufactured during the "basing" or price-fixing period are no longer manufactured because of changing styles.[4] The Administrator has established maximum prices by reference to costs of manufacture. Conversely, this compels manufacturers to spend a stated minimum amount in manufacturing a garment to be sold at a stated price line. The margin of profit is thus frozen. MPR 287 originally restricted the manufacturer to those price lines which he had sold between certain dates comprising the basing period hereinbefore referred to. The manufacturer was required to prepare a "pricing chart" covering this period which showed for each of the price lines at which the manufacturer sold garments, his direct labor and materials costs and the amount of his profit. The profit figure is reduced arbitrarily to 90% of its total.[5] All figures are reduced to percentages and the manufacturer is required to expend as a minimum the same percentage of direct labor and material costs as he did during the basing period for a garment selling at the same price line. He is allowed a tolerance of 3% and may expend as little as 97% of his minimum allowable costs without offending the Regulation.

MPR 287 was originally intended to restrict and did restrict, the manufacturer to making and selling only the price lines which appeared on his pricing chart. Subsequently MPR 287 was amended. The manufacturer was thus permitted to sell at price lines other than those listed on his pricing chart.[6] These price lines are called "optional" price lines by the OPA. The optional selling price line may not be higher than the highest selling price line listed in the manufacturer's pricing chart for a gar-

---

[4] Counsel for the Administrator, apparently as an additional justification for the method of fixing price ceilings adopted by the Administrator, states plaintively that "a woman's dress beggars description as much as a woman's hat".

[5] For example if the difference between cost and selling price amounted to $3, the profit would be reduced to $2.70.

[6] This provision is contained in Section 10(b), Rule 2 as follows:
"Sales at selling price lines different from those listed on the pricing chart. A manufacturer may, at his option, sell a garment in a selling price line different from those listed on his pricing chart: Provided, The garment contains the mini-

mum allowable cost for the selling price line: And provided also, That the selling price line is not higher than the highest selling price line listed on his pricing chart in effect on the date of delivery for a garment of the same category number. The maximum allowable margin for the optional selling price line is the maximum allowable margin listed on the pricing chart for a garment of the same category number in either the next higher or the next lower selling price line, whichever margin is lower. The minimum allowable cost is calculated by multiplying the optional selling price line by the lower maximum allowable margin thus selected and subtracting the result from the optional selling price line."

ment of the same category number.[7] The Regulation also states that the maximum allowable margin of profit for the optional selling price line is the maximum allowable margin listed on the pricing chart for a garment of the same category number in either the next higher or next lower selling price line, whichever margin is lower. Thus the percentage of minimum allowable costs in the optional selling price line is maintained at the level of the original price lines. The minimum cost of manufacture is to be calculated by multiplying the optional selling price line by the lower maximum allowable margin thus selected and subtracting the result from the optional selling price line. An example of the operation of the Regulation is given in the Desk Book and is set out in the footnote.[8]

So much by way of explanation. The gist of this phase of the case follows. When the defendant charged into its "direct labor costs" the 8½% wage increase as directed by the Impartial Chairman it used an unauthorized and hence illegal item of cost. If this be deducted, the deduction brings the defendant's actual costs below the minimum allowable costs as determined by its pricing chart.

We will take the defendant's Style No. 600, categories 21 and 22, as an example. The cost shown by the defendant was $37.25. This included $1.27 as the amount charged into direct labor costs as the result of the 8½% wage increase. There was an agreed adjustment of 4¢ in the defendant's favor. If we subtract the amount of the 8½% increase of $1.27 and add the 4¢ credit, we find the net amount to be $35.94. This sum is the amount which the defendant was entitled to treat as its actual cost in manufacturing these garments. But the defendant sold these garments at its $63 price line; viz., for $57.96 since it deducted (as it was entitled to do) 8% for the trade. For its $63 price line according to its pricing chart its minimum allowable cost (less its 3% tolerance) was $37.08. It was $1.14

under the minimum allowable cost for that price line.

▮ Section 205(e) of the Act prescribes that the damages may be assessed at three times the amount of the overcharge. To ascertain the extent to which the price ceilings have been violated (the amount of the overcharge) it is necessary to compare the prices actually charged by the defendant with the maximum prices which under the Regulations could lawfully have been charged in view of the actual allowable costs. Thus it would be improper and meaningless to compare actual costs with the minimum allowable costs for the price actually charged. Consequently a damage figure of $1.14 for Style 600 would be irrelevant. On the contrary it is necessary to compute from the actual allowable costs the maximum lawful selling price.

Again using Style No. 600 as an example it is stipulated on the basis of the 8½% wage increase not being includable that the actual allowable cost was $35.94, an amount lying between the minimum allowable costs for the $63 and the $45 price lines respectively. According to Section 10(b) the maximum margin "for the optional selling price" listed on the pricing chart for a garment of the same category number is the margin for either the next higher or for the next lower selling price, whichever margin is lower. Turning now to the defendant's amended pricing chart, we find the maximum allowable margin to be lower on the $45 price line than on the $63 line, 39.22% as compared with 39.31%. To derive the maximum selling price from the minimum costs we reverse the formula of Rule 2. Thus the maximum allowable margin of 39.22% is deducted from 100%, the difference being 60.78%. The cost of $35.94 is then divided by 60.78%, the quotient being $59.13. From this is deducted the 8% allowance to the trade leaving $54.40 as the maximum selling price. The price is to be compared with $57.96 ($63 less 8% discount) which the defendant actually re-

---

[7] This was for the purpose of preventing manufacturers from moving into higher price lines where the profit ordinarily is greater, and neglecting the lower price lines.

[8] "For example: A manufacturer's Fall Pricing Chart contains selling price lines for misses' coats (Category No. 2) of $16.75 and $18.75, having maximum allowable margins of 32% and 36% respectively. If, in October, he chooses to sell misses' coats at $17.50, he calculates his maximum allowable margin for these $17.50 coats by taking the lower of the maximum allowable margins listed on his Fall Pricing Chart for his $16.75 and $18.75 selling price lines. The maximum allowable margin on his $17.50 coats is, therefore, 32%; and the minimum allowable cost for such coats is $11.90 ($17.50 × 32%= $5.60; $17.50 − $5.60 = $11.90)."

ceived. The difference is $3.56 and constitutes the amount of the overcharge per dozen. By multiplying the amount of the overcharge by the number of dozens sold the amount obtained is the overcharge. If, for example, the circumstances of the case at bar should require the imposition of damages of three times the amount of the overcharge, to ascertain the amount of such damages the gross overcharge would be trebled.

■ The defendant contends that no maximum prices or ceilings were actually set by the Administrator on its merchandise and that therefore MPR 287 provides no basis for sustaining a claim for damages. We fail to see the merit of this contention. The amount of the profit allowable to the defendant when it has made a certain expenditure is easily ascertainable. If it sells garments at a price line in excess of that permitted to it in view of the costs which have gone to the creation of the garments its profits consist of the difference between the prices at which it sold the garments and the price lines permissible to it in view of the minimum allowable costs. The defendant's argument that Rule 2 of MPR 287 was designed only to provide a method for ascertaining minimum allowable cost and was intended only to cover a case where a manufacturer having established price lines exercised his option to sell at an intermediate price line is untenable. Using Style 600 as an example it is true that the defendant sold garments covered by this style at the $63 price line and that it had established the $63 price line on its pricing chart but it had no right to do so for it failed to expend on Style 600 the minimum allowable costs. The defendant by its own acts and of its own volition established an optional price line for Style 600 by including the $8\frac{1}{2}\%$ wage increase in its costs. The Administrator properly has employed Rule 2 to establish the ad damnum saying in effect to the violator, "Since you have spent less than the minimum allowable cost for Style 600, you have established an optional price line and the difference between that line and the price at which you sold repre-

sents your illegal profit." The amount of the damage to the public is thus established.

■ The Administrator contends that when a manufacturer fails to meet his minimum allowable costs, less the 3% tolerance, the maximum price is to be calculated from the actual costs expended in creating the garment and not from a fictitious figure of which the actual costs expended constitute 97%. In short the Administrator takes the position that the tolerance must be employed in order to determine whether there has been a price ceiling violation, but when a violation has been found the tolerance may not be employed to reduce the measure of damages. This is correct.[9] The regulation respecting tolerance will admit of no other interpretation.

■■ The defendant interposed a general denial to the complaint and did not assert any affirmative defense, partial or otherwise. We were of the view until the petition for rehearing was filed that the defendant intended to interpose no partial affirmative defense to the complaint but, on the contrary, intended to stand upon the present record. The defendant now asserts that it wishes to ask leave of the court below to amend its answer and to assert as a partial affirmative defense allegations that its violations of the regulation were not wilful or the result of its failure to take practicable precautions. See the amendment to Section 205(e) effected by Section 108(a) of the Stabilization Extension Act of 1944, 50 U.S.C.A.Appendix § 925 (e), and such authorities as Bowles v. Glick Bros. Lumber Co., 9 Cir., 146 F.2d 566, 571, 572; Bowles v. Franceschini, 1 Cir., 145 F.2d 510, 513, 514, and Bowles v. Sharp, 8 Cir., 149 F.2d 148, 149. As we have stated the defendant moved to dismiss the complaint under Rule 41(b), 28 U.S.C.A. following section 723c, and therefore, on remand, it possesses the right to proceed to its defense. Federal Deposit Ins. Corporation v. Mason, 3 Cir., 115 F.2d 548, 551, 552. The question of whether or not the defendant may amend its answer upon remand is one which rests within the discretion of the District Court pursuant to Rule

---

[9] The provision for the 3% tolerance is found in § 30(a) (13) of MPR 287. § 30 prescribes the instructions for preparing cost records and is to be distinguished from § 10, Rule 2, setting forth the method of computing optional selling price lines. § 30(a) (13) reads as follows: "Tolerance. If a manufacturer finds that his estimated calculations of the direct cost on a cutting are inaccurate, then for the purpose of this regulation, each garment in that cutting will be deemed to have the minimum allowable cost, if the direct cost is no less than 97% of the minimum allowable cost for that selling price line in that category number."

15(b). In respect to the issue of damages see Bowles v. Heinel Motors, D.C., 59 F. Supp. 759, 762, affirmed by this court 149 F.2d 815.

█ Whether or not an injunction should issue is a question to be determined by the court below in the exercise of its legal discretion upon consideration of all the evidence.

The judgment is reversed and the cause is remanded with direction to the court below to proceed in accordance with this opinion.

On Second Petition for Rehearing.

PER CURIAM.

In our opinion as amended by the order of December 6, 1945, we stated, inter alia, that the defendant, having moved to dismiss the complaint under Rule 41(b), 28 U.S.C.A. following section 723c, "possesses the right to proceed to its defense." It was our intention to indicate that the defendant might proceed to any and all defenses open to it. But, as we also stated, the question of whether or not the defendant may amend its answer upon remand is one which must rest within the discretion of the District Court.