# UNITED STATES *v.* UNITED STATES GYPSUM CO. ET AL.

No. 30.   Argued October 19, 1950.—Decided November 27, 1950.

*Charles H. Weston* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Bergson, Edward Knuff* and *Robert L. Stern.*

*Bruce Bromley* argued the cause for the United States Gypsum Co. et al., appellees. With him on the brief were *Cranston Spray, Albert R. Connelly* and *Hugh Lynch, Jr.*

*Norman A. Miller* argued the cause for Certain-Teed Products Corporation, appellee. With him on the brief were *Donald N. Clausen, Herbert W. Hirsh* and *Charlton Ogburn.*

*Andrew J. Dallstream, Walter G. Moyle, Ralph P. Wanlass* and *Albert E. Hallett* submitted on brief for the Celotex Corporation, appellee.

*Elmer E. Finck* for the National Gypsum Co., *Joseph S. Rippey* for the Ebsary Gypsum Co., Inc. and *David I. Johnston* for Gloyd, appellees, also submitted on brief.

Mr. Justice Reed delivered the opinion of the Court.

This proceeding was filed in 1940 in the District Court of the United States for the District of Columbia by the United States under the authority of the Attorney General. 15 U. S. C. § 4. The complaint charged, ¶ 44, a long-continued conspiracy by defendants in restraint of trade in gypsum products among the several states and in the District of Columbia, and a similar monopoly, all in violation of §§ 1, 2 and 3 of the Sherman Antitrust Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2, 3. The defendants, appellees here, were United States Gypsum Co., patentee, and various other gypsum board manufacturers, its licensees, and certain of their officers. It was alleged that the combination carried out its unlawful purposes as indicated in the excerpt from the complaint quoted below.[1] Civil relief, through prohibitory and mandatory orders, was prayed in various appropriate forms. After the United States concluded its evidence in chief at the trial, a three-judge District Court, 15 U. S. C. § 28, granted appellees' motion to dismiss under Rule 41 (b) of the Federal Rules of Civil Pro-

[1] "45. Said combination has been formed, has been carried out, and is being carried out by each of the defendant companies (acting, in part, through those of their officers and directors made defendants herein) and by other companies hereinafter referred to engaged in the manufacture of said gypsum products. Said companies have entered into, have carried out, and are carrying out said combination for the purpose, and with the effect, of restraining, dominating, and controlling the manufacture and distribution of said gypsum products in the Eastern area by:

"(a) Concertedly raising and fixing at arbitrary and noncompetitive levels the prices of gypsum board manufactured and sold by said companies in the Eastern area;

"(b) concertedly standardizing gypsum board and its method of production by limiting the manufacture of board to uniform methods, and by producing only uniform kinds of board, for the purpose, and with the effect, of eliminating competition arising from variations

cedure on the ground that no right to relief had been shown. On direct appeal, 15 U. S. C. § 29, we reversed the judgment of dismissal, March 8, 1948, *United States v. United States Gypsum Co.*, 333 U. S. 364, and remanded the case to the District Court for further proceedings in conformity with our opinion.

On remand a conference took place at the Government's suggestion. The Court acted under procedure similar to pretrial, Rule 16, and its inherent power to direct a case so as to aid in its disposition. As a result of that conference, without objection from any party, the Government filed a motion for a summary judgment under Rule 56 on the ground that there was no genuine issue as to any material fact, and the appellees filed an offer of proof, directed at matters as to which appellees were of the opinion a genuine issue existed. A summary judgment, without other findings than those contained in the decree, was entered November 7, 1949, on appellant's motion.[2] Both

in methods of production and in kinds of board manufactured and distributed in the Eastern area;

"(c) concertedly raising, maintaining, and stabilizing the general level of prices for plaster and miscellaneous gypsum products manufactured and sold by said companies in the Eastern area:

"(d) concertedly refraining from distributing gypsum board, plaster, and miscellaneous gypsum products manufactured by said companies through jobbers in the Eastern area, and concertedly refusing to sell said products to jobbers at prices below said companies' prices to dealers, for the purpose, and with the effect, of eliminating substantially all jobbers from the distribution of said gypsum products in the Eastern area;

"(e) concertedly inducing and coercing manufacturing distributors to resell, at the prices raised and fixed by said companies as aforesaid, gypsum board purchased from said companies."

[2] The pertinent portions of the decree as entered below are set out in an appendix to this opinion (*post,* p. 96) in parallel columns with portions of the decree proposed by the Government in its brief here. This proposal is more limited than the Government's proposed decree offered in the District Court.

plaintiff and defendants took direct appeals from the decree to this Court. 15 U. S. C. § 29. Defendants' appeal objected to summary judgment on the ground of their right to introduce material evidence. That appeal was dismissed by this Court. 339 U. S. 959. The reasons for our action lay in the fact that our holding in our first opinion, 333 U. S. 364, justified a summary judgment for plaintiff on the issue of the violation of the Sherman Act when the record was considered in the light of our opinion and defendants' offer of proof on the remand. This point is discussed later in this opinion under subdivision I.

Probable jurisdiction was noted on the appeal of the United States. This is the case we are now discussing. For the same reasons that we dismissed defendants' appeal, this Court affirmed Article III of the District Court decree. Our order also carried the sanction of an injunction against violation of the decree, "pending further order of this Court." 339 U. S. 960.

The issues left for determination in this appeal are those raised by the United States in its effort to have the provisions of the District Court decree enlarged. It seeks to extend the injunctions against violations of the Sherman Act to cover gypsum products instead of being limited to gypsum board as defined in the decree; and to include interstate commerce generally instead of limiting the territorial scope of the decree to the eastern portion of the United States. It also seeks changes that forbid specific practices, in addition to price fixing, such as standardizing products, classifying customers, or adopting delivered price systems, all pursuant to the principal conspiracy. It seeks to compel licensing of all patents by United States Gypsum; to empower the Department of Justice to inspect certain records; to extend the decree's terms to cover individual defendants; and to require the defendants to pay all costs.

## I.

*Procedure on remand.*—In determining the present issues, it is necessary to consider the trial court's solution of the procedural problems presented by our remand. Our decree was a reversal of the trial court's dismissal of the complaint on the merits at the completion of plaintiff's, the United States', presentation of its evidence. In our opinion, 333 U. S. 364, 389, we said that

> "the industry-wide license agreements, entered into with knowledge on the part of licensor and licensees of the adherence of others, with the control over prices and methods of distribution through the agreements and the bulletins, were sufficient to establish a *prima facie* case of conspiracy."

We said that the intention of United States Gypsum and its licensees to act in concert to attain the purpose of the conspiracy, restraint of trade and monopoly, was apparent from the face of the license agreements. Pp. 389, 400.

> "The licensor was to fix minimum prices binding both on itself and its licensees; the royalty was to be measured by a percentage of the value of all gypsum products, patented or unpatented; the license could not be transferred without the licensor's consent; the licensee opened its books of accounts to the licensor; the licensee was protected against competition with more favorable licenses and there was a cancellation clause for failure to live up to the arrangements."

We stressed the acting in concert as differentiating the case from *United States* v. *General Electric Co.,* 272 U. S. 476, discussed on pp. 400 and 401 of 333 U. S., the concert of action being established by the favored licensee clause of the standard license agreement. 333 U. S. at 410.[3]

___
[3] Exhibit A and paragraph 4 referred to on p. 410 contain the licenses involved in this litigation.

In *United States* v. *Line Material Co.,* 333 U. S. 287, decided the same day as the *Gypsum* case, the opinion of the Court discussed the then standing of the *General Electric* rule as follows:

"We are thus called upon to make an adjustment between the lawful restraint on trade of the patent monopoly and the illegal restraint prohibited broadly by the Sherman Act. That adjustment has already reached the point, as the precedents now stand, that a patentee may validly license a competitor to make and vend with a price limitation under the *General Electric* case and that the grant of patent rights is the limit of freedom from competition . . . ." P. 310.

We added, pp. 311 and 312, that while the *General Electric* rule permitted a patentee to fix the price the licensee of patents may charge for the device, separate patent owners could not combine the patents and thus reach an agreement to fix the price for themselves and their licensees. There was no holding in our first opinion in *Gypsum* that mere multiple licensing violated the Sherman Act.[4] The facts and the language placed our judgment squarely on the basis that

"it would be sufficient to show that the defendants, constituting all former competitors in an entire industry, had acted in concert to restrain commerce in an entire industry under patent licenses in order to organize the industry and stabilize prices." P. 401.[5]

As appears from the preliminary statement of its decree, the trial court acted on that understanding of our holding.

---

[4] The dissenters in *Line* joined in the *United States Gypsum* opinion, since the concerted action in the *United States Gypsum* case was thought to violate the Sherman Act, despite their view that the mere multiplication of licenses, as in *Line,* "produces a repetition of the same issue [as in *General Electric*] rather than a different issue." 333 U. S. at 354.

[5] Gypsum's petition for rehearing sought a modification of this position. It argued that "separate but similar lawful agreements

See Appendix, *post,* p. 96. It was not necessary to reach the issue as to whether a mere plurality of licenses, each containing a price-fixing provision, violates the Sherman Act. It is not necessary now.

The reference, 333 U. S. at 389, to the establishment of a prima facie case of conspiracy by conscious industry concert in price fixing was directed at the basis for the admission of the separate declarations of alleged conspirators. Section V, pp. 399–402, of the opinion, however, contains our determination that an industry's concerted price fixing by license violates the Sherman Act *per se.* *United States* v. *Paramount Pictures,* 334 U. S. 131, 143.

Of course, when we remanded the case to the District Court the defendants had the right to introduce any evidence that they might have as to why all or any one of them should be found not to have violated the Sherman Act. Our reference at 333 U. S. 402, footnote 20, to *Gulbenkian* v. *Gulbenkian,* 147 F. 2d 173, shows that. See *Federal Deposit Ins. Corp.* v. *Mason,* 115 F. 2d 548, 552; *Bowles* v. *Biberman Bros.,* 152 F. 2d 700, 705. Furthermore, even though defendants had no substantial evidence to overcome the prima facie conclusion of Sherman Act violation, they had the right to lay facts before the court that were pertinent to the court's decision on the terms of the decree; for example, the purpose of the concerted action, or the reason for making new patents available to the licensees, or willingness to license all applicants for the patent privilege. Such rights, however, did not require the trial court to admit evidence that would not affect the outcome of the proceedings. They did not affect the power of the trial court to direct the progress of the case in such a way as to avoid a waste of time.

---

must still be lawful if the result is lawful and no preliminary agreements or understandings to make them could be unlawful." We denied rehearing. 333 U. S. at 869.

A summary judgment, under Rule 56, was permissible on remand. It was allowed, as the last paragraph of the preliminary statement of the decree shows, on the court's understanding that our opinion "held that the defendants acted in concert to restrain trade and commerce in the gypsum board industry and monopolized said trade and commerce among the several states in that section hereinafter referred to as the eastern territory of the United States . . . ." As heretofore explained, that conclusion followed from our decision, if no evidence that controverted our ruling was offered. It is therefore necessary to examine briefly the offer of evidence.

The offer contained sixty-two paragraphs of proposed evidence. A full exposition is impracticable. Stress was laid on the available evidence to rebut our finding of an industry plan to stabilize prices.[6] Evidence was offered to show the licenses were for settlement of alleged infringements, and individual in character and were not used as a subterfuge to gain price control. Such evidence would not affect our determination, set out above, that price-fixing licenses made in knowing concert by standardized price requirements violated the Sherman Act by their very existence.

Defendants offered to prove that royalties based on unpatented gypsum board were compensation for patent licenses and installment payment for prior infringement damages. Such proof would not affect the fact that such a royalty added to the cost of producing unpatented board.

---

[6] *E. g.*, "1. There was no agreement or understanding between the United States Gypsum Company (USG), patentee, and the other defendants or any of them that they would associate themselves in a plan to blanket the industry under patent licenses and stabilize prices or issue or cause to be issued substantially identical licenses to all of the defendants or any number of them."

Proof was offered that covenants against transfer of licenses, for price maintenance and for equality of license terms, and bulletin orders against rebates by selling other products at a cheaper price when patented articles were sold, were to protect the licensor's monopoly under its letters patent. It was offered to prove that the activities of the Board Survey Company, considered in our former opinion, 333 U. S. 364, 400, were to secure compliance with the licenses; that there was no agreement to eliminate jobbers but only a purpose to maintain patent prices by discontinuing the jobber's discount. Such proof, in view of our holding as to the Sherman Act, would not make legal concerted action under patents to stabilize prices. We pass over other offers of proof as clearly immaterial on the issue of liability for Sherman Act violation. Good intentions, proceeding under plans designed solely for the purpose of exploiting patents, are no defense against a charge of violation by admitted concerted action to fix prices for a producer's products, whether or not those products are validly patented devices. We do not think that, accepting the offers of fact as true, there is enough in the proffered evidence to change the actions of the defendants from the illegal to the permissible. A finding that the manufacturers did not violate the Sherman Act under the evidence introduced by the Government and that proffered by the defendants below would be clearly erroneous in view of the concert of action to fix industry prices by the terms of the licenses.[7]

We agree with a statement made by counsel for the Government in argument below that as a "matter of

[7] One of the defendants, Celotex Corporation, made a separate proffer of proof, indicating that it was the purchaser of a license from a licensee, American Gypsum Company. In the transfer, Celotex assumed the licensee's obligations to maintain the licensor's price. As Celotex took no other part in the conspiracy, it contends that the decree should not impose upon it any further restriction than a pro-

formulating the decree" many facts offered to be proven would have effect upon the conclusion of a court as to the decree's terms. However, we read the preliminary statement of the District Court to the decree and the summary decree itself as an adjudication of violation of the Sherman Act by the action in concert of the defendants through the fixed-price licenses, accepting as true the underlying facts in defendants' proof by proffer. The trial judges understood the summary judgment to be, as Judge Stephens said, "limited to that one undisputed question." Judge Garrett and Judge Jackson agreed.[8] That conclusion entitled the Government only to relief based on that finding and the proffered facts. On that basis we dismissed United States Gypsum's appeal from the decree, and on that basis we examine the Government's objection to the decree.

## II.

*The Government's proposed amendments to the decree.*—A trial court upon a finding of a conspiracy in restraint of trade and a monopoly has the duty to compel action by the conspirators that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance. Such action is not limited to prohibition of the proven means by which the

hibition against price maintenance. Since Celotex entered into the conspiracy by its purchase of the license with an agreement to operate in accordance with its terms, we think it should be treated in the decree like the other licensees.

[8] At the hearing on proper terms for the decree Judge Garrett said, "Judge Jackson and I thought that, within the limits of the decision of the Supreme Court, that decree should of course be granted and that nothing that was given us in the proffer of proof would change the attitude of the Supreme Court within the scope of those matters upon which it had specifically passed.

"Now, that was the summary judgment."

evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal.[9] Acts entirely proper when viewed alone may be prohibited.[10] The conspirators should, so far as practicable, be denied future benefits from their forbidden conduct.

The determination of the scope of the decree to accomplish its purpose is peculiarly the responsibility of the trial court. Its opportunity to know the record and to appraise the need for prohibitions or affirmative actions normally exceeds that of any reviewing court. This has been repeatedly recognized by us.[11] Notwithstanding our adherence to trial court responsibility in the molding of a decree as the wisest practice and the most productive of good results, we have never treated that power as one of discretion, subject only to reversal for gross abuse. Rather we have felt an obligation to intervene in this most significant phase of the case when we concluded there were inappropriate provisions in the decree.[12] In resolving doubts as to the desirability of including provisions designed to restore future freedom of trade, courts should give weight to the fact of conviction as well as the circumstances under which the illegal acts occur.[13] Acts in disregard of law call for repression by sterner measures than where the steps could reasonably have been thought

---

[9] *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 461; *Hartford-Empire Co.* v. *United States,* 323 U. S. 386, 409; *International Salt Co.* v. *United States,* 332 U. S. 392, 401.

[10] *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707, 724.

[11] *Associated Press* v. *United States,* 326 U. S. 1, 22; cf. *International Salt Co.* v. *United States,* 332 U. S. 392, 399–401. And see *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 185.

[12] *Standard Oil Co.* v. *United States,* 221 U. S. 1, 78–82; *United States* v. *American Tobacco Co.,* 221 U. S. 106, 184–188; *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 185–187; note especially *Hartford-Empire Co.* v. *United States,* 323 U. S. 386, 409–435.

[13] *Local 167, I. B. T.* v. *United States,* 291 U. S. 293, 299; *Hartford-Empire Co.* v. *United States,* 323 U. S. 386, 409.

permissible. We turn then to the Government's proposals for modification of the decree on the assumption that only a violation through concerted industry license agreements has been proven, but recognizing, as is conceded by defendants, that relief, to be effective, must go beyond the narrow limits of the proven violation.

(a) There is one change acceptable to the Government and United States Gypsum and which we think desirable. Article II, § 3, of the decree defines gypsum board as "made from gypsum and embodying any of the inventions or improvements set forth and claimed in any of the Patents." This is too restrictive, and the words "and embodying any of the inventions or improvements set forth and claimed in any of the Patents" should be stricken, if the definition is used.

(b) The Government accepts the finding of Article III of the decree but objects to Article V (2) and (3) because, read together, they allow agreements through price fixing by license between United States Gypsum and Pacific Coast licensees. The complaint of Sherman Act violation was restricted to the eastern territory of the United States. The evidence applied only to that area. However, the close similarity between interstate commerce violations of the Sherman Act in eastern territory and western territory seems sufficient to justify the enlargement of the geographical scope of the decree to include all interstate commerce. Article V of the Government's proposed decree indicates one way in which this extension could be accomplished.

(c) The Government asks an extension of the decree to include all gypsum products instead of patented gypsum board alone. Compare Appendix, Article V. The license agreements, as indicated above, required royalties on unpatented open edge gypsum board. Board Survey, the organization created to enforce the license agreements, found possibilities of price evasion to exist by a licensee's

cutting prevailing prices on other commodities, sold in conjunction with patented gypsum board. Bulletins, issued to standardize sale practices, criticized rebates as violative of the license agreements. 333 U. S. 364, 386. Defendants' offer of proof did not deny such effort to systematize sales. Their explanation was that the efforts were to enforce legitimate license agreements and were not calculated steps in conspiracy or monopoly. We think the Government's request that the decree's injunctions reach gypsum products, as defined in its proposed decree, is reasonable and should be allowed. See U. S. proposed decree, Article II, § 4, and Article V.

(d) The Government asks that the decree forbid standardization of trade practices through concerted agreement. Our former *Gypsum* opinion, pp. 382–383, gives a summary of the methods adopted. Another method of regulating sales was by special provision for certain classes of customers, jobbers and manufacturing distributors. See 333 U. S. at 397 and 399, n. 18. We think this would justify the Government's requests. Article V, §§ 3, 4 and 6.

(e) The Government asks the insertion of Article V, § 5, directed at an agreement for concerted action in selling or quoting products at prices calculated according to a delivered price system. It points out that such a system was said by this Court, 333 U. S. at 382, to have been employed, and no proffer of contrary proof has been made.

Defendants argue as follows: The price for the patented product was "the lowest combination of mill price and rail freight from mill to destination." Defendants urge that

> "The only witness at the trial who was interrogated about it said that the pricing system in the gypsum board industry was the very opposite of the basing point system; that the mill base prices were extended to all mills; and that it was really only a freight

equalization method of pricing which resulted in the customer always getting the lowest possible price no matter from whom he bought."

And they say

"It was not established by the license bulletins, but licensor, in stating the minimum price, merely used the method of pricing as it then existed."

Further, defendants point out

"If appellee companies are to be questioned as to their method of pricing, they should be afforded a full hearing for the presentation of all pertinent matters bearing upon their pricing practices and should not be called upon to defend themselves in a summary hearing for an alleged contempt of court."

We think the defendants are unduly apprehensive. The Government's proposed prohibition of delivered price arrangements is directed at concerted action, by agreement or understanding among the manufacturers, not at any system of pricing the individual manufacturer may adopt or any price that he may make.[14] Since the conspiracy for restraint of trade was furthered by this arrangement, use of such a method should be banned for the future. To avoid any possibility that an individual's meeting of competitors' prices would be construed as a contempt of the decree, we think proposed Article V, § 5 should read as follows:

"5. Agreeing upon any plan of selling or quoting gypsum products at prices calculated or determined pursuant to a delivered price plan which results in identical prices or price quotations at given points of sales or quotation by defendants using such plan;"

---

[14] See our discussion in *Federal Trade Comm'n* v. *Cement Institute*, 333 U. S. 683, 727–728.

(f) The Government objects to Article VI of the decree which provides, § 1, for compulsory licensing for 90 days to any applicant of all then-owned patents relating to gypsum board at not to exceed the standardized royalties as theretofore charged to defendant licensees. The objection is that the limited time makes the requirement futile except for present licensees. There is a corollary objection to Article VIII because of provisions in the approved license agreements. Particular reference is made by the Government to an approved provision requiring the licensee to report its monthly sales and price with right to Gypsum to have an inspection by a certified public accountant approved by the parties. The Government fears the competitive advantage to Gypsum of knowing its competitors' sales and prices, and the depressive effect of such information on a strenuous sales program by the licensee.

The Government suggests expanding the requirement of licensing to include all United States Gypsum patents, old and new, with a provision by which new patents may be excluded after five years. See proposed decree, Article VI, § 6. Other proposed changes require all licensees to receive equal treatment as to royalties, put the burden of establishing royalty values on United States Gypsum and allow a licensee to attack the validity of patents.

In *United States* v. *National Lead Co.,* 332 U. S. 319, 335–351, we recently dealt with problems of licenses and royalties after a finding of Sherman Act violation. The arrangements on account of which the companies manufacturing titanium pigments in that combination were adjudged violators were as offensive to the prohibitions of the Sherman Act as those proven in the present case. Depending largely upon the discretion of the trial court, we refused to modify the decree. It ordered the accused patent owners to license all patents controlled by them concerning titanium and titanium manufactures during

the succeeding five years at a reasonable royalty to be fixed by the Court. Paragraphs 4 and 7 of that decree, 332 U. S. at 335–337.

The terms of the *National Lead* decree are somewhat like those the Government asks here. In the present case there should be no requirement of reciprocal grants. 332 U. S. 336.

We think that the United States Gypsum Company should be required to license all its patents in the gypsum products field to all applicants on equal terms. Whether the term for compulsory licensing of new patents is to be five years, or for a longer period with the privilege to the appellees to move for a limitation for such new patents, as provided in the suggested decree, Article VI, § 6, we leave to the District Court. That court should provide for its determination of a reasonable royalty either in each instance of failure to agree or by an approved form or by any other plan in its discretion.

We disapprove the Government's suggestion that the burden of establishing the reasonableness of the requested royalty should be placed upon Gypsum by the decree. We do not decide where the burden of proof of value lies or who has the duty to go forward with the evidence in any particular instance.

We disapprove the Government's suggestion, contained in Article VI, § 5, that the decree shall not be taken as preventing an "applicant" (we construe this as meaning licensee) attacking the patent or as importing value to it. We see no occasion for this unusual provision and think it should be entirely omitted.[15]

We direct that Article VI of the decree be so modified as generally to conform to the above suggestions.

---

[15] *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173; *Edward Katzinger Co.* v. *Chicago Metallic Mfg. Co.,* 329 U. S. 394; *MacGregor* v. *Westinghouse Electric & Mfg. Co.,* 329 U. S. 402; and cf. *Scott Paper Co.* v. *Marcalus Mfg. Co.,* 326 U. S. 249.

We approve the Government's suggested provisions for inspection of licensees' books and reports to licensor, substantially as set out in proposed Article VI, § 2 (c).

(g) The Government seeks access to the records and personnel of the defendants for the purpose of advising itself as to the defendants' compliance with the judgment. See proposed Article VIII. Construing the article as we did in *United States* v. *Bausch & Lomb Co.*, 321 U. S. 707, 725, n. 6, we think the request reasonable. This article, or one of similar import, should be included in the decree.

(h) We have noted the Government's contentions in regard to the individual defendants, Avery, Knode, Baker, Ebsary and Tomkins, and its suggestion that Article III be modified so as to read "defendants" in the first line, instead of "defendant companies." It is true that these individuals signed the questioned agreements, but they were acting as officials and we think the provisions of Article V bar them from engaging in similar conspiracies.

(i) The Government asks that all costs be taxed against the defendant companies. Article IX, proposed decree; Article X, decree entered. We see no reason to interfere with the discretion of the trial court in this matter.

"With these general suggestions, the details and form of the injunction can be more satisfactorily determined by the District Court." [16] Its procedure for the settlement of a decree is more flexible than ours. The decree is reversed and the cause remanded to the District Court for further proceedings in conformity with this opinion.

*Reversed.*

Mr. Justice Black believes that all the amendments proposed by the Government to Article VI of the decree

---

[16] *Warner & Co.* v. *Lilly & Co.*, 265 U. S. 526, 533.

are necessary to protect the public from a continuation of monopolistic practices by United States Gypsum.

MR. JUSTICE JACKSON and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

## APPENDIX.

DISTRICT COURT DECREE OF NOVEMBER 7, 1949.

### *Preliminary Statement*

This cause came on for trial before this Court on November 15, 1943. At the conclusion of plaintiff's presentation of the case, defendants moved, pursuant to Rule 41 (b) of the Federal Rules of Civil Procedure, for judgment dismissing the complaint on its merits. The motion of defendants was granted August 6, 1946. The judgment so rendered by this Court was reversed by the Supreme Court of the United States, and the case was remanded to this Court for further proceedings in conformity with the opinion of the Supreme Court (333 U. S. 364).

Following the remand, the plaintiff, pursuant to Rule 56 of the Federal Rules of Civil Procedure, moved for summary judgment in its favor upon the pleadings and all of the proceedings which theretofore had been had in the case, or, in the alternative, for such further proceedings as this Court might direct, and defendants, by direction of the Court, filed proffers of proof.

Argument by counsel for the respective parties upon the motion of plaintiff was heard by the Court, and after due consideration of such argument and of defendants' proffers of proof, Garrett, J. and Jackson, J., constituting a majority of the Court, announced a ruling to the effect that plaintiff's motion for summary judgment would be granted, and Stephens, J., who presided during the trial, announced his dissent from such ruling.

Thereafter counsel for plaintiff and counsel for certain of the defendants submitted forms of final decrees for the consideration of the Court and also suggested findings of fact, the latter to be considered in the event the Court should deem it necessary to make any findings of fact additional to those originally found by it and to those stated in the opinion of the Supreme Court.

In due course, the Court heard arguments respecting the proposed decrees and the suggested findings of fact, and full consideration has been given thereto and to all prior proceedings—all being considered in the light of the decision of the Supreme Court which, as understood by the majority of this Court, held that the defendants acted in concert to restrain trade and commerce in the gypsum board industry and monopolized said trade and commerce among the several states in that section hereinafter referred to as the eastern territory of the United States, which section embraces all the states of the United States westward from the eastern coast thereof to the Rocky Mountains and including New Mexico, Colorado, Wyoming, and the eastern half of Montana.

| PROVISIONS OF DISTRICT COURT DECREE. | PROVISIONS OF UNITED STATES' PROPOSED DECREE. |
|---|---|

[The articles of these decrees have been rearranged to facilitate comparison.]

| Article I | Article I |
|---|---|
| This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states a cause of action against defendants under the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies", commonly known as the Sher- | This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states a cause of action against defendants under the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies," commonly known as the Sher- |

man Anti-trust Act, and acts amendatory thereof and supplemental thereto,

## Article II

As used in this decree:

1. "Defendant c o m p a n i e s" shall mean all of the corporate defendants and Samuel M. Gloyd, doing business under the name of Texas Cement Plaster Company.

2. The "Patents" shall mean United States Letters Patent and applications for United States Letters Patent owned by defendant United States Gypsum Company which are described in the Patent Licenses, as hereinafter defined, and continuations in whole or in part, renewals, reissues, divisions, and extensions thereof.

3. "Gypsum board" shall mean plaster board or lath (including perforated and metallized lath) and wallboard (including metallized wallboard) made from gypsum and embodying any of the inventions or improvements set forth and claimed in any of the Patents.

4. "Patent Licenses" s h a l l mean the patent license agreements which were in effect between defendant United States Gypsum Company and each of the other defendant companies at the time the complaint herein was filed and described in said complaint as follows: [Listed to cover all.]

## Article III

The defendant companies have acted in concert in restraint of trade and commerce among the several states in the eastern territory of the United States to

man Antitrust Act, and acts amendatory thereof and supplemental thereto.

## Article II

For the purposes of this judgment:

1. "Defendant c o m p a n i e s" shall mean all of the corporate defendants and Samuel M. Gloyd, doing business under the name of Texas Cement Plaster Company.

2. "Patents" shall mean United States Letters Patent and applications for United States Letters Patent relating to gypsum board, its processes, methods of manufacture, or use, and continuations in whole or in part, renewals, reissues, divisions, and extensions of any such patent or patent application.

3. "Gypsum board" shall mean plasterboard, lath, wallboard, special surfaced board, sheathing, liner board (including any such product which is perforated or metallized) made from gypsum.

4. "Gypsum products" shall mean gypsum board as defined in the preceding paragraph, and plaster, block, tile and Keene's cement made from gypsum.

5. As used in Article IV, "license agreements" shall mean the patent license agreements which were in effect between defendant United States Gypsum Company and each of the other defendant companies at the time the complaint herein was filed and described in said complaint as follows: [Listed to cover all.]

## Article III

The defendants have acted in concert in restraint of trade and commerce among the several states in the eastern territory of the United States to fix, main-

fix, maintain and control the prices of gypsum board and have monopolized trade and commerce in the gypsum board industry in violation of sections 1 and 2 of the Sherman Antitrust Act.

## Article IV

Each of the license agreements listed in Article II hereof is adjudged unlawful under the antitrust laws of the United States and illegal, null and void.

## Article V

Each of the defendant companies and each of their respective officers, directors, agents, employees, representatives, subsidiaries, and any person acting or claiming to act under, through or for them or any of them are hereby enjoined and restrained from

(1) the further performance or enforcement of any of the provisions of the Patent Licenses, including any price bulletin issued thereunder;

(2) entering into or performing any agreement or understanding among the defendants or any of them for the purpose or with the effect of continuing, reviving or reinstating any monopolistic practice.

(3) entering into or performing any agreement or understanding among the defendants or any of them in restraint of trade and commerce in gypsum board among the several states in the eastern territory of the United States by license agreements to fix, maintain or stabilize prices of gypsum board or the terms and conditions of sale thereof.

tain and control the prices of gypsum board and have monopolized trade and commerce in the gypsum board industry in violation of Sections 1 and 2 of the Sherman Antitrust Act.

## Article IV

Each of the license agreements listed in Article II hereof is adjudged unlawful under the antitrust laws of the United States and illegal, null and void.

## Article V

The defendant companies, and their respective officers, directors, agents, employees, representatives, and subsidiaries, be and each of them hereby is enjoined from entering into or performing any agreement or understanding to fix, maintain, stabilize, or make uniform, by patent license agreements or by other concerted action, the prices, or the terms or conditions of sale of, gypsum products sold or offered for sale or resale in or affecting interstate commerce; and from engaging in, pursuant to such an agreement or understanding, any of the following acts or practices:

1. Fixing, maintaining or making uniform the kinds, types, or varieties of gypsum products manufactured or sold, or the methods of manufacturing, selling, packaging, shipping, delivering or distributing gypsum products;

2. Refraining from the manufacture, sale or distribution of any kind, type, or variety of gypsum products or the method of manufacturing, selling, packaging, shipping, delivering or distributing gypsum products;

3. Agreeing upon or adhering to any basis for the selection or classification of purchasers of gypsum products;

100

4. Refraining from selling gypsum products to any purchaser or any class of purchasers;

5. Agreeing upon or adhering to any system of selling or quoting gypsum products at prices calculated or determined pursuant to a basing point delivered price system or any other plan or system which results in identical prices or price quotations at given points of sale or quotation by defendants using such plan or system;

6. P o l i c i n g, investigating, checking or inquiring into the prices, quantities, terms or conditions of any offer to sell or sale of gypsum products.

## Article VI

1. Defendant United States Gypsum Company is hereby ordered and directed to grant to each applicant therefor within 90 days after the effective date hereof, but only in so far as it has the right to do so, a non-exclusive license to make, use and vend under any, some, or all patents and patent applications now owned or controlled by it relating to gypsum board, provided that such license agreement fixes a royalty not to exceed the royalty of the same article or process fixed in the license agreements set out in Article II hereof.

2. Defendant United States Gypsum Company is hereby enjoined and restrained from making any sale or other disposition of any of said patents or patent applications which would deprive it of the power or authority to grant such licenses, unless in any sale, transfer or assignment it shall be required that the purchaser, transferee or assignee shall observe the provisions of this section.

## Article VI

1. Defendant United States Gypsum Company is hereby ordered and directed to grant to each applicant therefor a non-exclusive license to make, use and vend under any, some or all of the patents now or hereafter owned or controlled by it; and is hereby enjoined from making any sale or other disposition of any of said patents which deprives it of the power or authority to grant such licenses, unless it requires, as a condition of such sale, transfer or assignment, that the purchaser, transferee or assignee shall observe the requirements of Articles VI and VIII of this judgment and unless the purchaser, transferee or assignee shall file with this Court, prior to consummation of said transaction, an undertaking to be bound by said articles of this judgment.

## Article VIII

The forms of license agreement which the Court has this day ordered filed herein are hereby approved; and the tender by defendant United States Gypsum Company to each applicant for a license agreement containing the terms and conditions set forth in the applicable filed form or forms shall constitute compliance by defendant United States Gypsum Company with the provisions of Article VI.

2. Defendant United States Gypsum Company is hereby enjoined from including any restriction or condition whatsoever in any license or sublicense granted by it pursuant to the provisions of this article except that (a) the license may be nontransferable; (b) a reasonable non-discriminatory royalty may be charged, which royalty may not be imposed upon or measured by patent-free products, processes or uses; (c) reasonable provisions may be made for periodic inspection of the books and records of the licensee by an independent auditor or any person acceptable to the licensee, who shall report to the licensor only the amount of the royalty due and payable; (d) reasonable provision may be made for cancellation of the license upon failure of the licensee to pay the royalty or to permit the inspection of its books and records as hereinabove provided; (e) the license must provide that the licensee may cancel the license at any time after one year from the initial date thereof by giving 30 days' notice in writing to the licensor.

3. Upon receipt of written request for a license under the provisions of this article, defendant United States Gypsum Company shall advise the applicant in writing of the royalty which it deems reasonable for the patent or patents to which the request pertains. If the parties are unable to agree upon a reasonable royalty within 60 days from the date such request for a license was received by United States Gypsum Company, the applicant therefor may forthwith apply to this Court for the determination of a reasonable royalty, and United

States Gypsum Company shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Attorney General, who shall have the right to be heard thereon. In such proceeding, the burden of proof shall be on United States Gypsum Company to establish the reasonableness of the royalty requested by it, and the reasonable royalty rates, if any, determined by the Court shall apply to the applicant and all other licensees under the same patent or patents. Pending the completion of any such proceeding the applicant shall have the right to make, use and vend under the patents to which his application pertains without payment of royalty or other compensation except as provided in paragraph 4 of this article.

4. Where an application has been made to this Court for the determination of a reasonable royalty under paragraph 3 of this article, United States Gypsum Company may apply to the Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If the Court fixes such interim royalty rate, United States Gypsum Company shall then issue and the applicant shall accept a license, or, as the case may be, a sublicense, providing for the periodic payment of royalties at such interim rate from the date of the filing of such application by the applicant. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action shall be grounds for the dismissal of his application. Where an interim license or sublicense has been issued pursuant to this paragraph, reasonable

royalty rates, if any, as finally determined by the Court shall be retroactive for the applicant and for all other licensees under the same patent or patents whose licenses provide for a higher royalty rate to a date to be fixed by the Court.

5. This judgment shall not be construed (a) as preventing any applicant from attacking, in this proceeding or in any other proceeding, the validity or scope of any patent of defendant United States Gypsum Company, or (b) as importing any validity or value to any such patent.

6. At any time after five years from the effective date of this judgment defendant United States Gypsum Company may apply to this Court, after notice to the Attorney General, for an order limiting the application of paragraph 1 of this Article to patents coming under the ownership or control of the United States Gypsum Company prior to the date of such application; and the Court, upon a showing by United States Gypsum Company that the effects of defendants' combination have been dissipated and that competitive conditions in the gypsum board industry have been restored, shall grant said application and enter an order modifying paragraph 1 of Article VI of this judgment.

## Article VII

Nothing contained in this decree shall be deemed to have any effect upon the operations or activities of said defendants which are authorized or permitted by the Act of Congress of April 10, 1918, commonly called the Webb-Pomerene Act, or the Act of Congress of August 17, 1937, commonly called the Miller-Tyd-

## Article VII

Nothing contained in this judgment shall be deemed to have any effect upon the operations or activities of the defendants which are authorized or permitted by the Act of Congress of April 10, 1918, commonly called the Webb-Pomerene Act, or the Act of Congress of August 17, 1937, commonly called the Miller-

ings Act, or by any present or future act of Congress or amendment thereto; provided, however, nothing contained in this article shall in any manner affect the provisions of Article VI of this decree.

Tydings Act, or by any present or future act of Congress or amendment thereto; provided, however, nothing contained in this article shall in any manner affect the provisions of Article VI of this judgment.

### Article VIII

For the purpose of securing compliance with this judgment, authorized representatives of the Department of Justice, upon written request of the Attorney General or an Assistant Attorney General to any defendant company and upon reasonable notice, shall be permitted, subject to any legally recognized privilege, access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant relating to any matters contained in this judgment. Any authorized representative of the Department of Justice shall be permitted to interview officers or employees of any defendant company regarding any such matters, subject to the reasonable convenience of said defendant but without restraint or interference from it; provided, however, that such officer or employee may have counsel present. No information obtained by the means provided in this article shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of such Department, except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this judgment or as otherwise required by law.

### Article X

Judgment is entered against the defendant companies for 50% of the costs to be taxed in this proceeding, and the costs so to be taxed are hereby prorated against the several defendant companies as follows: [Here follows allocation.]

### Article IX

Jurisdiction of this cause, and of the parties hereto, is retained by the Court for the purpose of enabling any of the parties to this decree, or any other person, firm or corporation that may hereafter become bound thereby in whole or in part, to apply to this Court at any time for such orders, modifications, vacations or directions as may be necessary or appropriate (1) for the construction or carrying out of this decree, and (2) for the enforcement of compliance therewith.

### Article IX

Judgment is entered against the defendant companies for all costs to be taxed in this proceeding, and the costs so to be taxed are hereby prorated against the several defendant companies as follows: [Here follows allocation.]

### Article X

Jurisdiction of this cause, and of the parties hereto, is retained by the Court for the purpose of enabling any of the parties to this judgment, or any other person, firm or corporation that may hereafter become bound thereby in whole or in part, to apply to this Court at any time for such orders, modifications, vacations or directions as may be necessary or appropriate (1) for the construction or carrying out of this judgment, and (2) for the enforcement of compliance therewith and the punishment of violations thereof.