MAVCO, INC., Respondent, *v.* HAMPDEN SALES ASSOCIATION et al., Appellants.

First Department, March 15, 1948.

*John H. Glaccum* of counsel (*Herman Vogel* with him on the brief; *Munn, Liddy & Glaccum,* attorneys), for Hampden Sales Association, Inc., appellants.

*Kenneth W. Greenawalt* of counsel (*Martin A. Schenck* with him on the brief; *Davies, Auerbach, Cornell & Hardy,* attorneys), for F. W. Woolworth Co., appellant.

*Eugene M. Foley* for W. T. Grant Company, appellant.

*Chester B. McLaughlin* of counsel (*Lester D. Stickles* and *Rodger Whelan* with him on the brief; *McLaughlin & Stickles,* attorneys), for respondent.

SHIENTAG, J. Plaintiff Mavco, Inc. (hereinafter referred to as "Mavco") is the maker of a face powder compact and has brought this action to restrain defendants from unfair competition in the marketing of another compact made by Hampden Sales Association (hereinafter called "Hampden").

Mavco manufactures compacts, cigarette holders and cases made of plastics. These articles are sold to the public over the facsimile signature of one Eleanor Hamlin as their publicized stylist. In 1942, Mavco conceived a design for a compact to simulate a cut precious jewel. This was ultimately called "Eleanor Hamlin — Gem-Cut". But it was not until 1944 that the "gem-cut" idea was reduced to a blueprint since it was difficult to obtain the necessary materials in war time. In September, 1944, Mavco ordered from Erie Resistor Corporation a mould for the production of the plastic compact and 50,000 completed compacts. However, there were further delays owing to a shortage of material and the compacts were not available for distribution to the public until after June, 1945; they were then offered for sale at approximately $2.95 each. No substantial sales are reported before August, 1945.

Early in 1945, Mavco employed an advertising agency to lay out a program for advertising this compact. On August 15, 1945, there appeared in *Vogue* a full page color advertisement of the "Gem-Cut" compact; another appeared in the September, 1945, issues of *Mademoiselle* and *Charm Magazine*; in January, 1946, in the magazine *Modern Plastics* there was a

full color advertisement of the " Gem-Cut " design and an article featuring it. In March, 1946, there was further advertising in *Chain Store Age* and in May, 1946, in the issue of *Mademoiselle*. There was also some newspaper and retail store advertising in various parts of the country. The total direct advertising expenditure was $46,000 of which 25% was devoted to the " Gem-Cut " item. The Hamlin name was featured in practically all of the advertisements.

A record of plaintiff's sales of this item was put in evidence and shows sales from August, 1945, to June, 1946. The largest sales of any month were in November, 1945, when 19,000 compacts were sold. For the other months of the period the sales were not large at any time and showed a falling off before the defendant's compact appeared on the market. Some reference is made to a falling off in foreign sales which were never very large, but there is no showing that defendant's article was responsible for this.

Hampden was incorporated in 1931, and between 1931 and 1946 sold 50 million different articles, mostly cosmetics, bearing the name " Hampden ", some 20 million of which were sold through the Woolworth stores. Since the early part of 1943, Hampden, as was quite natural in its business, had included compacts in its line. That year Hampden made and sold a wooden compact on which its name appeared. Hampden had marketed a fabricated lucite compact in April, 1945. Fabricated compacts are much more costly than moulded ones since they are made largely by hand. Hampden has now turned to the manufacture of metal compacts; it was not possible to manufacture such compacts during the war and the industry resorted to substitutes. Over half a million dollars was spent in advertising the name " Hampden ". Prior to 1944, a company having nothing to do with this case, Volupte, marketed a compact simulating a gem. In 1944, a company known as Belayre marketed a compact with a faceted top for which a design patent was issued. In 1944, Hampden began to work on a moulded compact which resulted in the making of the lucite compact the sale of which is being attacked in this action by plaintiff. This compact itself is marked " Hampden " and is sold under a line named " Cafe Society " which was originated in April, 1945.

The essence of the complaint against defendant is that its compact is " gem-cut " in appearance just like plaintiff's. According to defendant's testimony, Hampden employed a modelmaker to work out a new model for a moulded plastic

compact in June, 1945. The finished model was delivered in October, 1945. Hampden found the model unacceptable and Hampden's president, Leavin, said he was not satisfied with the general appearance; that it was not attractive enough. In October, 1945, Leavin purchased, in the open market, one of plaintiff's "Hamlin, Gem-cut" compacts which he thought was very effective. He showed the compact to his designers and changes were made in the design of the "Hampden" compact and the faceting was changed so that the general appearance of the top of the compact is similar to plaintiff's article. There are, however, some differences. For example, the bottom of the Hampden compact is rounded and the hinges and clasp are different. The name "Hampden" appears in a special lettering on the powder puff of defendant's compact. This form of printing "Hampden" has long been used by defendant and does not in any way imitate plaintiff's form of advertising of the name "Hamlin". The name "Hamlin" appears in facsimile script on the powder puff, the compact and the containers made by plaintiff. The name Mavco also appears on the compact itself.

Hampden's compacts were first delivered in January, 1946, and the first shipments to retailers were made in March, 1946. The compact was made up in quantity and was retailed largely through defendants Grant and Woolworth, as well as through department stores. Hampden did not advertise this new article but it was shown by the retailers as one of the general so-called Cafe Society line. Hampden's article was sold for $1.39. The only time "gem cut" was used in connection with the sale of Hampden's compact was in one of Woolworth's branches. This was unauthorized by defendants. Woolworth's manager did it on his own initiative and his act was disavowed and the practice discontinued.

There was an attempt to prove a more direct connection between the products by the testimony of a Mrs. Kaplan who worked on the advertising campaign for plaintiff. Mrs. Kaplan was trying to get the Hampden advertising account and had various meetings with Samuel Leavin, representing Hampden. Mrs. Kaplan says she showed him samples of the advertising layout relating to Mavco's compact. In this conversation Mrs. Kaplan said she told Leavin that she did not know where Mavco had its moulds made. Mrs. Kaplan also testified that Mrs. Leavin told her she had seen laminated displays and merchandise in the stores and thought it beautiful. Mrs. Kaplan's conversation occurred in the summer of 1945. Taking the

testimony for all that plaintiff urges it is worth, what we have here is a claim of calculated and deliberate simulation of plaintiff's "Hamlin — Gem-Cut" compact.

There is no claim of patent infringement and, if there were, it would not be the province of this court to give relief. The principles governing this type of unfair-competition claim have been thoroughly clarified. One of the most recent decisions is *Lucien Lelong, Inc.,* v. *Lander Co., Inc.* (164 F. 2d 395). In that case the court considered a claim of unfair competition where each party was selling a ball-shaped, long-necked perfume bottle. The plaintiff had been using this design for years and had obtained a patent on it which had expired. The plaintiff did not claim that it had originated the bottle because such a shape had been in use for centuries. The principles laid down by Judge CLARK are that under such circumstances as those described the plaintiff can prevail only if it proves that its style of bottle has acquired a secondary meaning; that without that it was not unfair competition for another to copy it (*Swanson Mfg. Co.* v. *Feinberg-Henry Mfg. Co.,* 147 F. 2d 500, 503). To establish a secondary meaning it is necessary to show (1) that the design is a mark of distinction identifying its source and (2) that purchasers are moved to buy the article because of its source (*Crescent Tool Co.* v. *Kilborn & Bishop Co.,* 247 F. 299; *Kaylon, Inc.,* v. *Collegiate Mfg. Co.,* 255 App. Div. 209; *Kellogg Co.* v. *National Biscuit Co.,* 305 U. S. 111). Generally, the secondary meaning must have been established when the defendant entered the field (*Upjohn Co.* v. *William S. Merrell Chemical Co.,* 269 F. 209, certiorari denied 257 U. S. 638). In addition to this, the plaintiff must show that confusion has been created by the defendant's sales in the market or that there is likelihood of confusion (*Lektro-Shave Corp.* v. *General Shaver Corp.,* 92 F. 2d 435). For example, in *Armstrong Paint & Varnish Works* v. *Nu-Enamel Corporation* (305 U. S. 315, 335), the court said: "Here we have a secondary meaning to the descriptive term, 'Nu-Enamel'. This establishes entirely apart from any trade-mark act, the common law right of the Nu-Enamel Corporation to be free from the competitive use of these words as a trade-mark or trade-name. * * * this right of freedom does not confer a monopoly on the use of the words. It is a mere protection against their unfair use as a trade-mark or trade name by a competitor seeking to palm off his products as those of the original user of the trade name. This right to protection from such use belongs to the user of a mark which has acquired a secondary meaning. He is, in this sense, the owner of the mark."

. With these principles in mind, we reach the conclusion that plaintiff here has failed to make out a cause of action on the present record. The cases are clear that the courts do not, as a rule, find invention in the discovery of one of nature's fundamental designs or forms and do not favor monopolies in such designs (*Knapp* v. *Will & Baumer Co.*, 273 F. 380). Ordinarily, the taking of a design from one substance and using it upon another is not an invention and plaintiff, even if the first user of faceting in plastics, could obtain no monopoly in respect thereto (*Metallic Industries, Inc.*, v. *Brauning*, 279 F. 856). Furthermore, in this case there had been other users of faceted designs and all that appears here is that plaintiff produced a compact simulating a cut jewel and claimed rights in that design which other people who had used it before had not claimed. The history of the use of the style of plaintiff's compact warrants no inference that the public had associated the shape or style of this compact with the particular make involved. The number of sales alone claimed for plaintiff's compact is so small that no secondary meaning could have been established. Mere popularity of an article manufactured under a certain name is not enough. As was said by Judge LEARNED HAND in *Crescent Tool Co.* v. *Kilborn & Bishop Co.*, (247 F. 299, 301, *supra*) as long ago as 1917: " It is not enough to show that the wrench became popular under the name ' Crescent '; the plaintiff must prove that before 1910 the public had already established the habit of buying it, not solely because they wanted that kind of wrench, but because they also wanted a Crescent, and thought all such wrenches were Crescents."

There is not the slightest evidence on this record to prove that the sales of this article by any of the defendants were effected because people thought they were buying a Mavco " gem-cut " compact; there is no evidence of confusion or deception or of misrepresentation actual or likely. In the *Upjohn* case (269 F. 209, *supra*), it was squarely held that the plaintiff was entitled to relief against unfair competition only where the defendant attempts to palm off on the purchasing public his goods as the goods of the plaintiff. There, in relation to secondary meaning the court said (p. 213): " The article had just been introduced to the trade that summer; only by the filling of prescriptions and by sales induced by the druggists had the article become known to the consumer; and the best that can be said is that the stage was set for the formation of the phenolax habit — not that any appreciable fraction of the community had acquired it. Such a secondary meaning as

is here involved comes gradually. We do not think it can be manufactured overnight by intensive advertising." (See, also, *Spalding & Bros.* v. *Gamage, Ltd.*, 84 L. J. [Ch.] 449 [1915].)

As for the moral question involved, which is sometimes urged on the theory that one competitor should not deliberately imitate another competitor's wares, this question was very definitely disposed of in *Sinko* v. *Snow-Craggs Corporation*, (105 F. 2d 450). In that case there had been what might be called a flagrant and deliberate imitation of certain decorative knobs. The court said (p. 453): " Stated in a summary way, Sinko created a desire on the part of the public for one of two things, either for knobs made by Sinko, above all other knob makers, or for knobs made in a particular manner regardless of who made them. If it is the first situation, the law of unfair competition gives Sinko the right to monopolize or to exclude other makers from copying the product. If it is the latter situation, Sinko receives no such right to monopolize, even though he might have been the first one to make the article in the particularly desirable manner." It was also stated by Mr. Justice HOLMES (then Chief Justice of the Supreme Judicial Court of Massachusetts) in *Flagg Mfg. Co.* v. *Holway* (178 Mass. 83, 91); " The defendant has the right to get the benefit of that [public] desire even if created by the plaintiff. The only thing he has not the right to steal is the good will attaching to the plaintiff's personality, the benefit of the public's desire to have goods made by the plaintiff."

It is sometimes said that this rule makes the diligent thief immune while the one who might hesitate and delay·must give up his plunder. This question was answered, however, in the *Upjohn* case (269 F. 209, 214, *supra*), as follows: " The answer is that there can be no larceny, unless the title or possessory right of the first holder is better than that of the second taker, and that in this case, until the general public belief among users that tablets of this appearance were phenolax wafers had come into existence, plaintiff's title to this combination of characteristics was no better than defendant's." Of course, imitation must not be grounded in breach of faith or breach of contract (*Tabor* v. *Hoffman*, 118 N. Y. 30; *Montegut* v. *Hickson, Inc.*, 178 App. Div. 94; *Margolis* v. *National Bellas Hess Co.*, 139 Misc. 738).

In the last analysis, the decisions in these cases have been based on an aversion to granting a monopoly to anyone who was unable to secure a patent or statutory trade-mark unless it clearly appeared that the public would be deceived as to the

article it was purchasing or its origin (*Cheney Bros.* v. *Doris Silk Corp.*, 35 F. 2d 279, certiorari denied 281 U. S. 728).

On this record, no operative facts warranting an injunction are shown. There was no simulation of plaintiff's general mode of marketing, of packaging, or of its advertising. Plaintiff showed no confusion between the names " Hamlin " and " Hampden ", and the record establishes that Hampden has used its own corporate name on its products for years. Plaintiff certainly has no right to any exclusive use of lucite, to the particular method of fabrication, to the general shape of the compact, or to its facetings. The mere copying of a style, unprotected by patent or by statutory trade-mark (and there is no patent or statutory trade-mark involved in this case), does not in and of itself entitle the original designer to protection unless that copying is accompanied by conduct or circumstances constituting unfair competition (*Pocket Books, Inc.,* v. *Meyers,* 292 N. Y. 58; *Miss Susan, Inc.,* v. *Enterprise, etc., Undergarment Co., Inc.,* 270 App. Div. 747; *Kaylon, Inc.,* v. *Collegiate Mfg. Co., Inc.,* 255 App. Div. 209). There may be a similarity in the names " Hampden " and " Hamlin ". But the manner in which those names were used on the packages and on the powder puffs in the compact negatives any intent to deceive and was not calculated to bring about confusion or deception. Besides, " Hampden " was used long before plaintiff adopted the name " Hamlin" for its product.

Plaintiff might urge its right to the use of the words " gem cut " in connection with its compact as its common-law trade-mark. Even this, however, is not free from doubt for " gem cut " may be said to be a common descriptive term rather than fanciful, arbitrary or suggestive in character and not entitled to protection in the absence of a showing that it has acquired a secondary meaning. However, that issue is not before us and we do not pass upon it. The defendants, with one isolated exception which has been referred to, have not used the words " gem cut " or any simulation thereof and none of the defendants makes claim to the right to use those words in connection with any product manufactured or sold by them. The single use of " gem cut " in one store of the defendant Woolworth, unauthorized and disclaimed, does not give rise to a cause of action for unfair competition. Concededly, the charge of conspiracy broke down and has been abandoned on the appeal. What is shown is conscious adaptation of a shape and style already in the public domain and the selling of the product largely through chain stores at a cheaper price. No unfair competition has been established.

The judgment should be reversed, with costs and the complaint dismissed, with costs.

PECK, P. J., COHN and CALLAHAN, JJ., concur; VAN VOORHIS, J., concurs on the authority of *Cheney Bros.* v. *Doris Silk Corporation* (35 F. 2d 279, certiorari denied, 281 U. S. 728).

Judgment unanimously reversed, with costs and the complaint dismissed, with costs. Settle order on notice.