**NEWBURGH MOIRE CO., Inc.**
**v.**
**SUPERIOR MOIRE CO., Inc.**
Civ. A. No. 626-51.

United States District Court
D. New Jersey.
Dec. 4, 1953.

See also, 105 F.Supp. 372.

Harry B. Rook, Newark, N. J., for plaintiff by Samuel J. Stoll, Jamaica, N. Y.

Harry Sommers, Newark, N. J., for defendant.

MODARELLI, District Judge.

Plaintiff, Newburgh Moire Company, Inc., a New York corporation, brings this action to enjoin patent infringement against Superior Moire Co., Inc., a New Jersey corporation. The patents in suit are Patent Number 2,448,145 issued August 31, 1948, on an application filed April 14, 1947, for "Producing Moiré Designs," and Patent Number 2,513,646 issued July 4, 1950, on an application filed May 27, 1948, for "Art of Producing Moire Pattern Effects in Fabrics." Both patents were issued to August Holterhoff who assigned them to the plaintiff. The plaintiff has limited its case to the first claim of each patent.[1]

The patents in suit are process patents. The patents teach production of moire pattern effects in textiles. Moire is the process of incorporating into textiles a luster, with or without a pattern or design, by applying heat and pressure to the goods. If the weave is shifted or distorted prior to the application of heat and pressure, patterned luster effects are achieved.

Prior to the advent of the plaintiff's process, which we will refer to as the "H" process, five methods of producing moire were in commercial usage:

*Mirror Moire.* The fabric is doubled and passed through a calender, subjecting the goods to high pressure. The inside surfaces of the doubled goods attain an even luster. Patterns are not imparted by this method, though lines and shadows can be effected by doubling the goods in such manner that the filling threads intersect. It is to be noted that the goods are run dry in mirror moire.

*Bar Moire.* Also a dry process, varying from mirror moire in that before the doubled goods are fed to the calender they are separated by a bar (usually wood) which has notches or teeth along the upper and lower edges that contact the fabric. At the points of contact, the teeth distort the weave. The threads in the distorted areas intersect the threads of the opposing fabric as the material runs through the calender. Lines and shadows are added to the luster at these points of intersection.

*Calender Moire.* Again a dry process, differing from the above in that one of the calender rollers has engraved upon it a pattern or design. Pressure is thus applied on the fabric only at the raised portions of the engraved roller, imparting a design to the goods.

*Scratch Moire.* This process may be run wet or dry. The goods are run double through two rollers, usually in a wholly wet state. The rollers are not simply calenders, however. The one roller has engraved on it a pattern; the pattern is generally carved on rubber. The second roller is designed as a rotary

1. "The method of producing moiré pattern effects in fabrics comprising moistening the fabric in confined pattern areas, applying tension to the fabric, drying the fabric while maintaining tension, folding the fabric double, and applying heat and pressure to produce the finished moiré effect." Patent Number 2,448,145.
"The method of producing moiré pattern effects on fabrics comprising moistening the fabrics within confined pattern areas while applying tension to the same, drying the fabrics while maintaining the tension, doubling the thus treated fabrics and applying heat and pressure to produce the finished moiré effect." Patent Number 2,513,646.

beater. A plurality of scratch blades made of somewhat flexible metal run along the width of the roller. These blades strike against the fabric at high speed forcing the fabric against the raised pattern of the companion roller. The weave is thereby distorted in the raised pattern areas. The fabric is then sent through a set of smooth calender rollers to form the finished moire design. Scratch moire may be run dry, but seldom is.

Now, let us observe moire as practiced by plaintiff. The desired moire design is engraved on a pattern roller in bold relief on leather or rubber. Dry fabric is run over the wet pattern roller, wetting the fabric solely in the confined pattern areas. The fabric is next dried under tension over conventional heating apparatus, then folded double and sent through calenders under pressure.

The distinction between the plaintiff's first and second patents is only as to the time when tension is applied to the fabric. In the first Holterhoff Patent, tension is applied to the fabric *after* the application of moisture. In the second Holterhoff Patent, the tension is applied *while* the moisture is being applied.

More graphically then, the Holterhoff processes teach moire by these steps:

1. Moistening the fabric in confined pattern areas. (In plaintiff's second patent, No, 2,513,646, tension is applied during this step and maintained throughout step 2.)

2. Drying the fabric. (In plaintiff's first patent, No. 2,448,145, tension is not called for until this step.)

3. Folding the fabric double.

4. Applying heat and pressure (i. e., calendering) to produce the finished moire effect.

In plaintiff's plant, the Holterhoff Patents are applied with considerable advantage over the prior art. Their pattern roller is not a machined tool, merely a wood roller to which are tacked leather strips. The roller cost may be as low as $35 and requires little maintenance; whereas the complex scratch roller costs

about $1,000, and requires frequent attention. The engraved roll of the calender moire method likewise is more expensive and cumbersome than the pattern roll of plaintiff's process.

The scratch process requires beating the fabrics. Damage frequently occurs to the cloth. Delicate fabrics do not withstand the beating of the scratch roll. A man of mechanical and technical skill is needed to regulate the speed of flow and the pressures which are brought to bear on the fabric. In plaintiff's use of the "H" process, on the other hand, a less skillful employee can be entrusted to run the machinery as the action of the pattern roller on the fabric is gentle. For this same reason the "H" process may safely be applied to a wider variety of fabrics.

Finally, a considerable amount of material submitted for moire treatment under the older methods could not be processed. In this category fall "no match" fabrics, i. e., fabrics in which threads are improperly aligned. Such "no match" fabrics can readily be moired by the "H" process.

The plaintiff convinced the court that the method it used in moire processing had the advantages outlined above. Our inquiry, however, is whether the patent teaches a process sufficiently novel and advanced over the prior art to warrant upholding the patent monopoly, a most difficult question to answer. No diagrams or flow sheet are furnished to illustrate just how water is to be applied in confined pattern areas or how tension is to be effected. Let us consider whether the knowledge divulged by the first claim of plaintiff's two patents has been anticipated by prior patents. In particular, we will discuss seven of the nine patents upon which defendant relies to prove invalidity of plaintiff's patents because of prior art anticipation.

The Milhomme Patents, Number 1,-781,296 and Number 1,821,392, relate to the scratch process of moire finishing. The first of these patents introduced to the trade a wet method for scratch

moire, but neither anticipates Holterhoff's wetting in confined pattern areas. The second Milhomme Patent, however, teaches in detail a method of applying tension to the fabric as it is drawn around the pattern roll.

The British Sharp Patent, Number 21,-590, is not pertinent. Contrary to a confined wetting, the patent indicates the entire fabric is moistened to a "dewed or damp state," and passed between a pair of rollers both or either of which is engraved.

Dreyfus and Blume Patent, Number 1,780,645, produces brocade and differential luster effects on fabrics made of organic derivatives of cellulose. Its similarity to the "H" process is found in a statement that patterns can be effected by applying the printing paste with engraved or embossed rolls, plates or blocks. "If differential luster is desired, the matte printing paste will be applied locally by any suitable method such as by printing with engraved or embossed rolls, plates or blocks or by brushing or spraying through stencils having appropriate designs therein." Page 1, col. 2, 11. 93–98. The similarity to Holterhoff's Number 2,513,646 can be readily noted by quoting from that patent, page 1, col. 2, 11. 45 to 50:

"In order that the moisture be applied solely to the areas prescribed by the pattern a wetted roller may be used having raised portions representing the design or a stencil; an engraved printing cylinder may be employed or a hand sponge or brush or any combination of these means * * *."

The idea of wetting in confined pattern areas is advanced further by Guillame Lardy, Patent Number 1,803,672, applied for July 7, 1928, and issued May 5, 1931. At page 2, col. 1, 11. 20 to 28, Lardy states:

"In producing ornamental or decorative effects on fabrics formed wholly or partly of dulled or matt appearing cellulose actetate threads, *predetermined areas of the fabric may be moistened,* after which the entire fabric may be subjected to a heated calendering operation. The portions of the fabric which have been moistened assume a brilliant luster or sheen." (Emphasis Supplied.)

Again at page 2, col. 2, 11. 110 to 119, Lardy claims " * * * wetting predetermined or local areas of fabrics * * " followed by hot calendering " * * * whereby patterns having a luster are formed on a dull background."

Again this idea is found in the Dreyfus Patent, Number 1,860,456. Claim 1 of Dreyfus refers to locally applying water to the fabric and then calendering it " * * * whereby lustrous patterns are produced where the water has been applied." At page 2, col. 1, 11. 33 to 44, Dreyfus discloses:

"Another application of my invention is for the production of mottled or printed effects due to difference of lustre of the surface of the fabric. This can be done by *wetting those parts of the delustered fabric that are to be relustered while keeping the rest of the fabric dry.* The so partially wetted fabric is then ironed with a hot iron or calender maintained at above 100° C. as above set forth. The parts of the fabric that have been wetted are thus relustered while the surface of the dry parts are unaffected." (Emphasis Supplied.)

Plaintiff in his patent states: "moistening the fabric in confined pattern areas." It is readily apparent that this step is anticipated by the Lardy and Dreyfus Patents. Significantly, plaintiff's expert did not testify regarding these pertinent teachings by the Lardy and the Dreyfus Patents.

The step of folding the fabric double is well-known in the textile industry and predates the patents in suit. To cite a few patents submitted by defendant which anticipate this step:

The Milhomme Patent, Number 1,781,-296, states, "The application of heat and

pressure to the folded fabric causes the design to be reproduced upon both of the inner or abutting surfaces of the layers * * *." Page 1, col. 2, 11. 84–87.

The Lancaster and Witteck Patent, Number 578,570, states, "After the displacement of the threads * * * the fabric is passed, while still folded, through a pressing-machine, and the displaced threads of one side of the fabric act as dies upon the undisplaced threads of the other side of the fabric * * ." Page 1, col. 1, 11. 43–48.

The calendering operation is so common in processing of textiles that judicial notice may be taken of its use prior to the date of plaintiff's patents.

There remains only the step of applying tension to the fabric. Of crucial importance in this court's mind is the determination of the effect that the application of tension has upon the fabric in the Holterhoff processes.

The Holterhoff Patent 2,513,646 states:

"The design or pattern impression is produced according to my invention by the combined action of heat, moisture within confined areas and tension, the conjoint action of which produces an adequate setting of the moiré patterns in the fabric, the heat and tension being simultaneously applied to cause quick drying and warping of the threads." Page 1, col. 2, 11.26 to 33.

"The applied tension while acting with the same force on the wet and the dry portions of the fabric causes a different reaction insofar as the wet portions undergo a dislocation of the structure while the dry portions resist the tension better and practically preserve their structure." Page 2, col. 1, 11. 17 to 22.

"The fabric may now be run under tension over a heated cylinder * * the speed * * * the temperature * * * and the tension on the fabric being suitably adjusted to produce the final moiré designs * * *." Page 2, col. 1, 11. 54 to 59.

The court posed to itself these questions: In the processing of fabrics is the application of tension a novel or an ordinary step? If ordinary, is the application by Holterhoff of a markedly different degree or manner than theretofore employed, and if so, is this distinction sufficient to warrant grant of the privilege of a patent monopoly?

Certain it is that when a fabric is run through a series of rollers and calenders, there must be a force exerted to cause the fabric to flow. The fabric is, therefore, under some tension. The court is convinced that in various fabric processings tension is applied and controlled by means of brakes which are adjusted by the operator while the fabric is being run, to meet conditions which vary with the speed of the cloth, the pressure of the rolls, the weight and texture of the fabric. An example is found in the Milhomme Patent, Number 1,821,392, issued September 1, 1931. The Lardy Patent, Number 1,803,672, does not speak of tension. Yet tension must certainly be applied in order to run the fabric through the ovens and calenders, and a person skilled in the art would be well able, upon studying the Lardy Patent, to practice the process, applying that amount of tension necessary to insure a smooth, continuous run.

If the application of tension is not novel, then is the degree and manner of application novel. For if not, then certainly the Lardy Patent anticipates the patents in suit. The patents in suit do not specify how or how much tension is to be applied. It is asserted that the Holterhoff Patents rely on the skill of the mill worker to judge the application of tension; that experienced mill hands are expected and able to feel the requirements as the fabric is run. The court agrees with this assertion. But here plaintiff seeks to prove novelty of patents on the ground that the patent directs tension to do more than merely force

the fabric through roller and calender, namely, to dislocate the warp and the weft, and this in combination with moisture and quick calender to produce the moire effect. But if the tension were a key factor of the process, i. e., if tension were here used to do more than force the fabric to flow through the mill, would the patent be devoid of more specific direction as to amount of tension or the manner of application of that tension? I think not. And if the tension required were to be no more than that normally employed to run fabrics through processing mills, does not the Lardy Patent anticipate the patents in suit? I think yes. Though Lardy does not specify tension, is not positive tension necessary to cause the fabric to flow through the mill, and cannot Lardy leave the implication as well as the application of tension to the skilled artisan? I feel he can. These are questions of fact which the court, unskilled in art of moire, must answer to the best of its ability.

■■■ I feel that one skilled in the art would, with a general knowledge of moire and with the disclosures of the Lardy, Milhomme and Dreyfus Patents, must find the Holterhoff processes obvious advances in the art, but that is not invention. By the tests of the Patent Code and the applicable cases, the court must hold the patents in suit invalid. Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Lincoln Engineering Co. v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Toledo Pressed Steel Co. v. Standard Parts, Inc., 1939, 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Packwood v. Briggs & Stratton Corp., 3 Cir., 1952, 195 F.2d 971. Note also New Wrinkle, Inc., v. Watson, Commissioner, 1953, 96 U.S.P.Q. 438, where the court said:

"The coming into effect pending this appeal of new Title 35 U.S.C. revising and codifying the provisions of the United States Code on Patents, does not help appellants. Under section 103 of the new act, 'if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the ·time the invention was made to a person having ordinary skill in the art', a patent may not be obtained. The Report of the Committee on the Judiciary of the House of Representatives, of May 12, 1952, accompanying H.R. 7794, which became the act, says of this section;

"'* * * An invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered, sufficiently great to warrant a patent. * * *' (H.R.Rep.No. 1923, 82d Cons.2d Sess. 7 (1952)."

■■ The complaint contains a count for unfair competition. It was shown to the court's satisfaction that defendant has used designs so similar to plaintiff's that even defendant's own expert and defendant's attorney confused the products processed by plaintiff and by defendant. In addition to striking similarity in design, plaintiff showed that defendant had copied in some cases identical names for the patterns, and in other cases confusingly similar names. Although the court may dislike such practice, it may not enjoin it or penalize defendant for it. The essence of unfair competition is the practice of palming off one's product as that of another. No assertion, let alone proof, was made that defendant had gone that far. In point of fact, both parties are processors. They do not manufacture the goods. They receive goods from manufacturers or jobbers, process and return them. Certainly defendant's customers are aware that it is defendant who is processing the fabrics. Defendant does not represent itself to be another. Thus, there is no deceit as against the purchaser, and certainly none was shown against the public.

"As to the second count for unfair competition, the case is indistinguishable from Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279, certiorari denied 281 U.S. 728, 50 S. Ct. 245, 74 L.Ed. 1145, where it was held that anyone might copy plaintiff's silk patterns which had not been protected by a design patent or by a copyright. See also Lewis v. Vendome Bags, Inc., 2 Cir., 108 F.2d 16, certiorari denied 309 U.S. 660, 60 S.Ct. 514, 84 L.Ed. 1008, and Electric Auto-Lite Co. v. P. & D. Mfg. Co., 2 Cir., 109 F.2d 566. The New York law is also in accord with these decisions. Mavco, Inc. v. Hampden Sales Ass'n, 273 App.Div. 297, 77 N.Y.S.2d 510; Margolis v. National Bellas Hess Co., 139 Misc. 738, 249 N.Y.S. 175.

"There is no charge that defendants have misrepresented their dresses as those of plaintiff—only that they have knowingly copied plaintiff's design and color combination and used them in making dresses which they are selling at a price lower than plaintiff does or can do. But this is not unlawful, and does not constitute unfair competition." Verney Corp. v. Rose Fabric Converters Corp., S.D.D.C.N.Y., 1949, 87 F.Supp. 802, 804.

In Herzman Scarfs, Inc. v. Baar & Beards, Inc., 203 Misc. 449, 118 N.Y.S.2d 380, 381, the court said:

"Neither the courts of this state nor the Federal courts are disposed to grant a monopoly to any one without benefit of patent. Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12; Swank, Inc. v. Anson, Inc., 1 Cir., 196 F.2d 330; Mavco, Inc. v. Hampden Sales Ass'n, 273 App.Div. 297, 77 N.Y.S.2d 510. There seems to be nothing unlawful in copying an unpatented article or design by another, provided the public is not deceived thereby into buying the article of the defendant in the belief that it is the article of that other.

Kaylon, Inc. v. Collegiate Mfg. Co., Inc., 255 App.Div. 209, 7 N.Y.S.2d 113; Mavco, Inc. v. Hampden Sales Ass'n, supra; Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73.

See also A. C. Gilbert Co. v. Shemitz, 2 Cir., 1930, 45 F.2d 98, 100; French American Reeds Mfg. Co., Inc. v. Park Plastics Co., Inc., 1951, 14 N.J.Super. 450, 82 A.2d 468; Weiss v. Stork & Gift Shop, 1946, 137 N.J.Eq. 475, 45 A.2d 688. The plaintiff's count for unfair competition must be rejected.

■ Plaintiff filed a prior suit for this same cause of action, which was settled. By the terms of settlement, defendant agreed to cease using plaintiff's process. Plaintiff agreed to keep the terms of that settlement secret. Defendant now asserts that as plaintiff in the present suit referred to the settlement, it breached the terms of the settlement and demands return of the $1,000 consideration. It does not seem to this court that defendant is justified in crying breach when defendant itself first breached the settlement by proceeding to use plaintiff's improved process in violation of the same settlement agreement. At no time during the course of this trial or in the documents submitted on the case did defendant claim or attempt to show that it had not copied plaintiff's improved process. The demand for return of the $1,000 is unwarranted and is denied.

■ Defendant requests counsel fees in connection with its successful motion to dismiss which was followed by plaintiff's cancellation of the anti-trust provisions of its agreement with licensees. In the exercise of its discretion, the court denies this request.

■ Finally, defendant's request for treble damages for plaintiff's violation of the anti-trust laws is denied. This court is convinced that plaintiff acted in accordance with advice of counsel, and that both plaintiff and counsel in good faith felt their activities were not violative of the anti-trust laws.

The foregoing opinion shall constitute findings of fact and conclusions of law, as required by Rule 52, Fed.Rules Civ. Proc., 28 U.S.C.A.

An order may be submitted in conformity with the opinion herein expressed.